[No. 11139-3-III.    Division Three.    April 28, 1992.]

THE STATE OF WASHINGTON, *Respondent,* v. JOSE R.
RODRIGUEZ, *Appellant.*

*Hugh M. Spall,* for appellant (appointed counsel for appeal).

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Barry D. Sherman, Deputy,* for respondent.

THOMPSON, A.C.J. — Jose R. Rodriguez appeals his conviction for first degree assault, contending the trial court erred in denying his motion to suppress evidence seized from his mother's apartment and from a garbage receptacle used by apartment residents. We affirm.

On July 20, 1990, at approximately 11:30 p.m., Armando Martinez, a volunteer emergency medical technician with the Grandview Fire Department, responded to a call about a stabbing in a Grandview apartment. When Mr. Martinez arrived at the scene, Leobegilda Cortez was bleeding from cuts which appeared to have been inflicted by a large knife. He observed blood on the couch, floor and walls of the apartment. He bandaged Ms. Cortez' arms and head and helped place her on a gurney so she could be taken to a hospital. While Mr. Martinez was aiding Ms. Cortez, Sergeant Ware of the Grandview Police Department was talking to one of her children. Mr. Martinez heard the child say something about light brown clothing, light brown pants and light brown shirt.

Mr. Martinez is also assistant chief of the Grandview Police Department. After providing emergency medical treatment to Ms. Cortez at the scene, he went home and changed into his police uniform. He then drove to Sunnyside Hospital, where Ms. Cortez was taken, because he was the only Spanish-speaking officer and the victim spoke Spanish as a primary language.

At the hospital, Ms. Cortez told Assistant Chief Martinez her assailant was about 5 feet 8 inches to 5 feet 9 inches tall, "had short hair", "was Hispanic, but not Mexican", and

"was not quite fluent with the Spanish language". She described him as thinner than her brother who was present with her while she was being questioned. She said he attacked her with a large knife that looked like a machete.

After leaving the hospital, while en route to Grandview, Assistant Chief Martinez heard a radio transmission in which Sergeant Ware stated a suspect had been spotted at the Hillcrest Nursing Home in Grandview. The suspect, described as 5 feet 8 inches to 5 feet 9 inches tall, wearing brown pants, a light colored shirt, possibly gray, and carrying a large, shiny knife, had identified himself to the Hillcrest janitor as "Lilly's son, Roberto".

Shortly after the first radio report, Sergeant Ware announced the address of a Grandview apartment where Lilly Rodriguez lived. The apartment was approximately a block and a half from the victim's home, and 11 blocks from the nursing home. Assistant Chief Martinez was familiar with the Rodriguez apartment, having been there 2 weeks earlier when Lilly Rodriguez' son had been stabbed with an ice pick, and on other occasions regarding Lilly Rodriguez' daughter.

Assistant Chief Martinez arrived at the apartment shortly before Officer Garcia. Assistant Chief Martinez testified at the suppression hearing that at approximately 1:47 a.m. he knocked several times at the apartment door and identified himself as a policeman. He said he heard someone walk to the door, back away, and walk up to it again. When Lilly Rodriguez opened the door, he asked if her son was in the apartment. She told him no. He then asked permission to search for him in the apartment, and she replied "[y]es, come in" and gestured for him to do so.

At the suppression hearing, Officer Garcia testified he arrived as Assistant Chief Martinez was knocking on the door. He said he heard him ask Ms. Rodriguez for permission to enter the apartment and look for her son. According to Officer Garcia, Ms. Rodriguez responded "Sure, come on in", "come on in" or something to that effect. He was behind Assistant Chief Martinez and did not see Ms. Rodriguez make any gestures.

Ms. Rodriguez testified that when the officer asked if her son was home, she looked where he was lying but he was not there, so she told the officer no, he was not there. She said the officers then walked in. According to her testimony, they did not ask permission, but "said they had to see". She also testified she never told the officers to leave or said she did not want them there.

Assistant Chief Martinez knew the floor plan of the 1-bedroom apartment from his previous visits. He went first to the bedroom and saw an older man lying in bed. He testified he apologized to the man, then proceeded toward the bathroom. The bathroom door was closed, but he could see a light from below the door. He knocked and asked if anyone was there. There was no response so he opened the unlocked door. Assistant Chief Martinez saw a man with short hair and light brown pants sitting on the toilet. His pants had stains on them which he testified looked like blood. Assistant Chief Martinez drew his pistol and ordered the man to stand up and put his hands on top of his head. About the same time, Assistant Chief Martinez said he heard Sergeant Ware behind him say "[t]hat's the one". Sergeant Ware testified he arrived at the Rodriguez apartment as the bathroom door was being opened. He testified he had earlier interviewed the victim's 7-year-old daughter at her home. According to Sergeant Ware, the daughter was extremely emotional, but was able to describe her mother's attacker as a male with light brown clothing, carrying a knife and maybe he had a beard. Sergeant Ware then talked to the janitor at the Hillcrest Nursing Home who reported the prowler. The janitor described the prowler as 5 feet 8 inches or a little taller, with a puffy face, khaki pants, a lighter colored shirt, maybe gray, and short hair which came to a point in the front. The prowler was said to be carrying a big knife.

Sergeant Ware testified that when he saw Mr. Rodriguez in the bathroom and observed the puffy face, "widow's peak" and khaki-colored pants, he announced Mr. Rodriguez was the man for whom they were looking.

Assistant Chief Martinez testified that the defendant had no shirt or shoes on and that he noticed a pair of boots and a towel on the dining room table and a jacket on a chair. There was blood on the towel. The lights in the apartment were on and the table was about 10 feet from the entrance door.

Assistant Chief Martinez put the boots, towel and jacket in his patrol car and went into the alley behind the apartment with Chief Charvet who had remained outside with reserve officers. Assistant Chief Martinez stated they checked the alleys, streets, backyards, and trash cans in search of the weapon used in the crime.

Assistant Chief Martinez testified Chief Charvet went directly to a 300-gallon garbage receptacle located about 30 feet south of the apartment, shined his light in it, and removed a blue bag from the top of the pile. There was blood on the side of the bag. Chief Charvet opened it and found letters addressed to the victim and a plastic hospital bracelet with the victim's name on it. He testified the container served the apartment complex in which Ms. Rodriguez lived.

Assistant Chief Martinez returned to the police station to begin the process of obtaining a warrant to search Ms. Rodriguez' apartment, since they had not yet found the weapon. It was determined that Lilly Rodriguez was the only person renting the apartment. A warrant was issued and executed.

Defendant was charged with first degree assault. He moved to suppress the boots, towel, and jacket obtained in the apartment, contending it was seized pursuant to an illegal search and illegal arrest. The motion was denied. Defendant was tried by the court and found guilty. This appeal followed.

Ms. Rodriguez testified her son got out of prison on Friday and slept on her living room floor that night. He was arrested early Sunday morning. When asked if she expected him to live with her, Ms. Rodriguez said she did not know and could not say.

Defendant contends he had a right to expect privacy in his mother's bathroom, a right separate from the privacy right which his mother enjoyed. According to defendant, although his mother could give consent to a search of other rooms in the apartment, she could not validly consent to a search of the bathroom so long as he was in it. He cites as authority *State v. Berber*, 48 Wn. App. 583, 740 P.2d 863, 74 A.L.R.4th 491, *review denied*, 109 Wn.2d 1014 (1987); *Rakas v. Illinois*, 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978); *Katz v. United States*, 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967).

The State contends the warrantless search of the apartment was constitutional because Ms. Rodriguez gave a valid consent and the search of the bathroom was within the scope of that consent. We agree.

■ Defendant's reliance on *Berber* and its particular facts is misplaced. *Berber* does not stand for the proposition that anyone in a bathroom can expect special privacy rights that will take precedence over other rights to search. In *Berber*, the issue was whether defendant had a reasonable expectation of privacy in a public bathroom. The court said he did. Here, the issue is whether defendant had a reasonable expectation of privacy in the home where he was apprehended.[1]

*Minnesota v. Olson*, 495 U.S. 91, 98, 109 L. Ed. 2d 85, 94, 110 S. Ct. 1684 (1990) held an overnight guest has a legitimate expectation of privacy in his host's home, an expectation which is not inconsistent with the host's ultimate control and right to admit or exclude others. Here, Mr. Rodriguez had the right to expect privacy in his mother's home, not just in the bathroom. However, since he was only sharing the home, his expectation was not absolute. A host or third party who has dominion and control over the

---

[1]Although Mr. Rodriguez cites *Berber*, a decision based on privacy rights under the Washington Constitution, he relies on the federal "expectation of privacy" test and does not consider the six criteria for analyzing claims under the state constitution, *see State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986). Therefore, we treat this assignment of error as one brought under the Fourth Amendment and rely upon decisions of the United States Supreme Court.

premises may consent to a search, whether it is for purposes of arrest or seizure of evidence.

> The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, see *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), or from a third party who possesses common authority over the premises, see *United States v. Matlock*, [415 U.S. 164, 171, 39 L. Ed. 2d 242, 94 S. Ct. 988, 993 (1974)].

(Citations omitted.) *Illinois v. Rodriguez*, 497 U.S. 177, 111 L. Ed. 2d 148, 110 S. Ct. 2793, 2797 (1990). *See also Minnesota*, 495 U.S. at 99 (the host may admit or exclude others from the house as he prefers).[2]

Here, Mr. Rodriguez was apparently a temporary guest in his mother's home. Although he had an expectation of privacy, that expectation was qualified by the possibility his mother would consent to a search of her apartment. The trial court found she did. Therefore, the police officers' search for and arrest of Mr. Rodriguez was constitutional.

We next address defendant's contention the evidence seized from his mother's apartment should have been suppressed because it was seized as a result of his illegal arrest.

██ Probable cause to arrest exists

> where the facts and circumstances within the arresting officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in a belief that an offense has been committed.

(Footnote omitted.) *State v. Terrovona*, 105 Wn.2d 632, 643, 716 P.2d 295 (1986). There must be more than a "bare

---

[2]*State v. Leach*, 113 Wn.2d 735, 744, 782 P.2d 1035 (1989) is distinguishable because Leach was not an overnight guest or even a temporary resident, but a cohabitant with equal or greater control than the other person occupying the premises. *Leach*, at 744, held:

> Where the police have obtained consent to search from an individual possessing, at best, equal control over the premises, that consent remains valid against a cohabitant, who also possesses equal control, only while the cohabitant is absent. However, should the cohabitant be present and able to object, the police must also obtain the cohabitant's consent.

suspicion" that the defendant engaged in the criminal activity. *Terrovona*, at 644, and cases cited therein.

When the officers arrived at the apartment, they were aware of substantial evidence a crime had been committed. Though they had a suspect, they were still investigating by whom the crime had been committed. Seeing Mr. Rodriguez in person, they then had probable cause to believe he had committed the crime. He did not fit the descriptions given in every detail, but known facts were sufficient to rise above a "bare suspicion". His physical appearance, blood on his pants, presence in Ms. Rodriguez' home, and Hispanic appearance all collectively provided probable cause to arrest.

■ The evidence was seized from the table and. chair after Ms. Rodriguez consented to the search and after the arrest. It was properly seized as evidence in "plain view".

> The "plain view" doctrine is an exception to the Fourth Amendment's warrant requirement that applies *after* police intrude into an area in which there is a reasonable expectation of privacy. Under the plain view doctrine, an officer must: (1) have a prior justification for the intrusion; (2) inadvertently discover the incriminating evidence; and (3) immediately recognize the item as contraband. A resident's consent to enter his home constitutes "prior justification for the intrusion" into an area in which there is a reasonable expectation of privacy. Discovery is inadvertent if the officer "discovered the evidence while in a position that does not infringe upon any reasonable expectation of privacy, and did not take any further unreasonable steps to find the evidence from that position." *State v. Patterson*, 37 Wn. App. 275, 281, 679 P.2d 416, *review denied*, 103 Wn.2d 1005 (1984).

(Citations omitted.) *State v. Myers*, 117 Wn.2d 332, 346, 815 P.2d 761 (1991).

Based on the consent of Ms. Rodriguez, the officers had prior justification for being in her apartment. Their discovery of the boots, towel, and jacket on the dining room table was inadvertent. They did not take unreasonable steps to find these items. As in *Myers*, the items were on a table in the room by which the officers passed with the occupant's consent. The towel was recognized as potentially incriminating evidence because the officers knew the crime was bloody, and there was blood on the towel. As to the boots

and jacket, the defendant was shoeless and shirtless. The trial court did not err in denying the motion to suppress.

We turn next to defendant's contention that evidence seized from the apartment's garbage receptacle was inadmissible.

Admittedly, defense counsel withdrew his pretrial motion to suppress evidence seized from the garbage receptacle, apparently in reliance on *State v. Boland*, 55 Wn. App. 657, 781 P.2d 490 (1989). However, after trial and sentencing, the Court of Appeals' decision was reversed in *State v. Boland*, 115 Wn.2d 571, 800 P.2d 1112 (1990). Defendant contends on appeal that the Supreme Court's decision in *Boland* rendered the seizure unconstitutional under article 1, section 7 of the Washington Constitution.

The State objects to this court's consideration of *Boland*, contending defendant expressly waived his right to challenge admission of the evidence. *State v. Valladares*, 99 Wn.2d 663, 664 P.2d 508 (1983). We disagree.

■ A manifest error raising a constitutional issue may be raised for the first time on appeal. RAP 2.5(a)(3). Further, since the ruling at issue is a constitutional ruling in a criminal case, we must apply *Boland* retroactively. *State v. McCormack*, 117 Wn.2d 141, 145, 812 P.2d 483 (1991) (citing *Griffith v. Kentucky*, 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708 (1987)), *cert. denied*, 112 S. Ct. 1215 (1992). Finally, we find there was no waiver of this constitutional right under *Valladares* because, at the time of trial, the parties and the court would reasonably have relied on the decision of the Court of Appeals, which was subsequently reversed.

The pertinent facts of *Boland* are simple. Brad Boland lived in a single-family residence. He placed his trash in his personal trash can, secured the lid, and put it on the curb in front of his home for collection. Police began a series of four warrantless searches of Boland's garbage, attempting to obtain sufficient evidence for a warrant to search his home. Given these facts and having determined that review was to be conducted on independent state grounds, the *Boland* majority concluded,

> defendant Boland's private affairs were unreasonably intruded upon . . .. Boland's trash was in his can and sitting on the curb in

expectation that it would be picked up by a licensed garbage collector. This leads us to the conclusion that it falls squarely within the contemplated meaning of a "private affair".

*Boland*, 115 Wn.2d at 578. And, under article 1, section 7 of the Washington Constitution, the issue "is whether the 'private affairs' of an individual have been unreasonably violated rather than whether a person's expectation of privacy is reasonable". *Boland*, 115 Wn.2d at 580.

At the onset, the *Boland* majority acknowledged that under the fourth amendment to the United States Constitution, no reasonable expectation of privacy exists in garbage left on the curbside for collection. *Boland*, 115 Wn.2d at 575 (citing *California v. Greenwood*, 486 U.S. 35, 100 L. Ed. 2d 30, 108 S. Ct. 1625 (1988)). However, once the court established that the criteria in *State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808, 76 A.L.R.4th 517 (1986) were met, the majority determined the privacy interests at issue were to be examined under state constitutional protections, not the less protective federal constitutional protections. Unlike *Greenwood*, *Boland* does not make the location of one's garbage "outside the curtilage of the home" determinative of its protection.[3] (Italics omitted.) *Boland*, 115 Wn.2d at 580.

■ Under the facts of this case, however, *Boland* is not dispositive. Here, the private affairs of an individual have not been unreasonably violated. Mr. Boland had collected his garbage during normal usage at his household, put it in his personal garbage can, and placed the can out on the curb in front of his home. Under the court's ruling, it was still part of his private affairs and constitutionally protected. Here, however, a bag is thrown on top of a 300-gallon garbage receptacle, which is the community dumpster for an apart-

---

[3] As the dissent notes, *Boland*, 115 Wn.2d at 591 (Guy, J., dissenting), the court previously determined location was a factor to be considered in determining the validity of governmental intrusion. *State v. Myrick*, 102 Wn.2d 506, 510-11, 688 P.2d 151 (1984). And, the United States Supreme Court in *Greenwood*, 486 U.S. at 40-41, concluded trash placed in an area accessible to the general public determines whether it receives constitutional protection. The latter cases rest on the analysis of a person's reasonable expectations of privacy, not an analysis of one's private affairs.

ment complex. It is not garbage ordinarily accumulated in a household, but rather is stolen property defendant is apparently attempting to hide. Under these circumstances, any expectation of privacy or expectation of nongovernment intrusion was unreasonable. *See State v. Jeffries*, 105 Wn.2d 398, 413-14, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986), which held a criminal defendant does not have a reasonable expectation of privacy in items hidden out of doors on property he does not own. Therefore, we conclude the court did not err in refusing to suppress the bag taken from the garbage receptacle.

Finally, defendant contends the trial court erred by imposing financial assessments without entering findings as to his ability to pay those assessments. However, as the State notes and the record reflects, the trial court found defendant indigent and ordered the financial order stricken.

We affirm.

MUNSON and SWEENEY, JJ., concur.

Review denied at 119 Wn.2d 1019 (1992).