[No. 23502-5-III.   Division Three.   October 4, 2007.]

THE STATE OF WASHINGTON, *Respondent*, v. PAUL DAVID WHITE, *Appellant*.

*Stephanie C. Cunningham*, for appellant.

*Ronald S. Zirkle, Prosecuting Attorney*, and *Kenneth L. Ramm, Jr., Deputy*, for respondent.

¶1 SCHULTHEIS, A.C.J. — Paul White was convicted of manufacturing methamphetamine on his mother's property after his motion to suppress was denied. On appeal, Mr. White argues that police could not rely on a neighbor's consent to search his mother's property, despite the limited authority of that third party, because he was present and had at least common authority not to consent, and he attempted to assert that right. He also contends that entry was not justified for community caretaking reasons. We agree and reverse.

## FACTS

¶2 Mr. White's mother, Janet White, owns real property and a residence in a rural area outside of Grandview, Washington. Bill Michener, a neighbor, leases orchards

surrounding Janet's[1] property. Mr. Michener owns a house and orchards adjacent to Janet's property. He has known her family since 1984.

¶3  Located on Janet's property is a multipurpose building that holds tools and houses the controls for the orchards' irrigation system and also has a furnished sunroom that opens to a garden. This building has always been unlocked. In the past, Mr. Michener had regularly come upon Janet's property and entered the building, sometimes with hired hands, to operate the irrigation controls and, at times, to use tools. Mr. Michener also had keys and the security code to Janet's residence and was given full access to the home and outbuildings.

¶4  When Janet was out of town, Mr. Michener helped out by watering her lawn and shrubs in the backyard and picking up her mail and newspaper. Janet had never expressly limited Mr. Michener's access to any part of her property. She assumed that Mr. Michener would deal with a break-in of her property if one occurred, and she had no problem with him taking the police into her premises under such circumstances. In fact, several years prior to the events in this case, Janet's security alarm went off when she was away, and Mr. Michener had police check inside the home.

¶5  Mr. White had not lived at his mother's residence for a few years, but he had permission to come and go and he, too, had keys and the access codes. Mr. White kept clothing at the residence and stored furniture and various other items in the outbuildings.

¶6  Janet left on a trip a couple of days before the events of May 7, 2003. She made the usual arrangements with Mr. Michener to look after her place. Mr. White did not tell either Janet or Mr. Michener that he would be at the residence during Janet's absence.

¶7  In the early morning hours of May 6, Mr. Michener came to Janet's property to irrigate the fields. At 3 or 4 AM

---

[1] In the interest of clarity, Janet White's first name will be used.

he recognized Mr. White's pickup parked near the irrigation room, and he saw lights coming from under the door of the room. By 8 AM, it appeared that Mr. White (or whoever was there earlier) had gone. Mr. Michener noticed an odd odor in the irrigation room.

¶8 When Mr. Michener returned the next morning, the door to the irrigation room was locked and a "very strong odor" was coming from inside.[2] Report of Proceedings (RP) (Apr. 13, 2004) at 44. Unlike the prior morning, Mr. Michener saw no vehicles parked nearby. He called the sheriff's office and requested that a deputy come out to investigate.

¶9 Yakima County Sheriff's Deputy Derrick Artz responded. Mr. Michener reported his observations to the deputy and stated that he had the authority to enter and use the building. Mr. Michener led the deputy to the irrigation room, which was still locked. As Mr. Michener began to walk around to try the sunroom door, Mr. White opened the irrigation room door. In a brief conversation, Mr. White identified himself and stated that he had a right to be there.

¶10 Deputy Artz smelled a strong ammonia-type odor coming from the open door. He sensed something was wrong because of Mr. White's body language, so he directed Mr. White to step outside. Mr. White initially refused. He complied when the deputy unholstered, but did not aim, his firearm. Deputy Artz secured Mr. White in a patrol car "so he could further investigate the situation." Clerk's Papers (CP) at 102 (Finding of Fact 15).

¶11 The deputy returned to the building and looked inside the doorway. On the ground, he saw a bucket filled with liquid that was emitting a vapor. He also saw a box

---

[2] The trial court's findings of fact had the deputy making these observations. Clerk's Papers at 101 (Finding of Fact 11) ("The Deputy smelled a strong chemical kind of ammonia type odor permeating out the open door."). Mr. White properly objects to this finding. Because the deputy had not yet arrived, we agree with Mr. White that this finding is not supported by substantial evidence. *State v. Hill*, 123 Wn.2d 641, 644-47, 870 P.2d 313 (1994); *see State v. Broadaway*, 133 Wn.2d 118, 129-31, 942 P.2d 363 (1997).

containing black and clear tubing, plastic bottles of HEET, and a 10-gallon container of paint thinner. Mr. Michener said that he had not seen the items in the shed before. Deputy Artz believed that the items were indicators of a possible methamphetamine lab.

¶12 Deputy Artz stepped inside and followed an extension cord from the irrigation room to a hotplate in the backyard. On top of the hotplate was a bubbling container of liquid that was emanating a strong ammonia odor. He returned to the patrol car and arrested Mr. White for manufacturing methamphetamine.

¶13 In denying Mr. White's motion to suppress the evidence, the trial court concluded that

> [a]lthough Deputy Artz's entry onto the property and into the [irrigation room] was made without a warrant, his entry was lawful because of Mr. Michener's invitation and request for the Deputy to enter the property and building to investigate. Mr. Michener was standing in the shoes of the property owner, as he had been given authority by Mrs. White to enter, use, and bring other people onto the property. Mr. Michener had actual authority to invite the Deputy to go inside the [irrigation room] and he had actual authority to give consent to search.

CP at 104 (Conclusion of Law 2).

¶14 The trial court further concluded that Mr. White's initial detention was lawful "based upon an articulable and substantial possibility that criminal conduct may have occurred." CP at 105 (Conclusion of Law 3). Finally, the trial court concluded that Deputy Artz had probable cause to arrest Mr. White based on what was found in the building.

¶15 Mr. White was convicted of one count of manufacturing methamphetamine after a stipulated facts trial on the evidence seized by the warrantless search of his mother's home. This appeal follows. We remanded for the entry of findings of fact and conclusions of law.

## DISCUSSION

¶16 We review challenged findings of fact related to a motion to suppress for substantial evidence. *State v.*

*Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding. *Id.* at 644. Conclusions of law pertaining to suppression of evidence are reviewed de novo. *State v. Johnson*, 128 Wn.2d 431, 443, 909 P.2d 293 (1996).

¶17 Article I, section 7 of the Washington Constitution provides greater protection to individual privacy rights than the Fourth Amendment to the United States Constitution. *State v. Jones*, 146 Wn.2d 328, 332, 45 P.3d 1062 (2002). "Article I, section 7 provides that '[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law.'" *Id.* (alteration in original) (quoting WASH. CONST. art. I, § 7). This state constitutional provision is violated when the State unreasonably intrudes upon a person's private affairs. *Id.* at 332.

¶18 Warrantless searches are per se unreasonable under article I, section 7 unless they qualify as specific exceptions to the warrant requirement. *State v. Ross*, 141 Wn.2d 304, 312, 4 P.3d 130 (2000). Warrant exceptions are "'jealously and carefully drawn . . . which provide for those cases where the societal costs of obtaining a warrant . . . outweigh the reasons for prior recourse to a neutral magistrate.'" *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002) (internal quotation marks omitted) (quoting *State v. Williams*, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984)). "'[W]here the police have ample opportunity to obtain a warrant, we do not look kindly on their failure to do so.'" *State v. Ferrier*, 136 Wn.2d 103, 115, 960 P.2d 927 (1998) (internal quotation marks omitted) (quoting *State v. Leach*, 113 Wn.2d 735, 744, 782 P.2d 1035 (1989)). The State has the burden to show that a warrantless search or seizure falls within one of the exceptions to the warrant requirement. *State v. Acrey*, 148 Wn.2d 738, 746, 64 P.3d 594 (2003) (quoting *State v. Kinzy*, 141 Wn.2d 373, 384, 5 P.3d 668 (2000)).

¶19 One recognized exception to the warrant requirement is a consent to search. *State v. Mathe*, 102

Wn.2d 537, 541, 688 P.2d 859 (1984). To establish valid consent, the State must show that the person consenting to the search had authority to consent. *State v. Thompson*, 151 Wn.2d 793, 803, 92 P.3d 228 (2004). Under Washington's constitution, "[o]ne who has equal or lesser control over a premises does not have authority to consent for those who are present and have equal or greater control." *State v. Morse*, 156 Wn.2d 1, 4-5, 123 P.3d 832 (2005).

¶20 "A third party may consent to a search if he or she possesses 'common authority over or other sufficient relationship to the premises or effects sought to be inspected.' " *State v. Holmes*, 108 Wn. App. 511, 518, 31 P.3d 716 (2001) (quoting *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974)). Common authority exists when there is " 'mutual use of the property by persons generally having joint access or control for most purposes.' " *Id.* (quoting *Matlock*, 415 U.S. at 171 n.7). "Access and permission to enter are the hallmarks of common authority." *Id.* at 520. This includes the authority to invite others into the area as Mr. Michener had done here. *Morse*, 156 Wn.2d at 11.

¶21 Under the circumstances here, however, the State has not shown authority to search on Mr. Michener's consent alone. "If the police choose to conduct a search without a search warrant based upon the consent of someone they believe to be authorized to so consent, the burden of proof on issues of consent and the presence or absence of other cohabitants is on the police." *Id.* at 15 (citing *Acrey*, 148 Wn.2d at 746).

¶22 The trial court found in finding of fact 7 that Mr. White had not lived at his mother's residence for a few years, but he had permission to come and go, and he also had keys to and the alarm access codes for the residence. We note that finding of fact 7 is supported by substantial evidence in the record through the testimony of Mr. Michener, the State's witness, who agreed that Mr. White had the same access to the premises that he had. Mr. White challenges this finding of fact and others that minimize his

right to access his mother's property. Mr. White raises a good point in that the record is replete with uncontested evidence of Mr. White's common authority.[3]

¶23 But we need no more factual bases than those contained in the trial court's findings in order to hold that the State did not meet its burden to show valid consent when someone who had common authority was present and attempting to assert it. As our Supreme Court has stated regarding the State's burden: "We recognize that issues of 'common authority' and 'presence' will not always be simple and straightforward. . . . However, such difficulties may be avoided by the police by obtaining either a search warrant or the consent of the person whose property is to be searched." *Id.* at 15 n.5.

¶24 Mr. White's objection to the court's finding of fact 9—that "[n]either Mrs. White nor Mr. Michener was told that [Mr. White] would be at the residence during [Janet White's] absence"—is well taken for its implication that Mr. White should have so informed someone. CP at 101. The record clearly shows that Mr. White had an open invitation for which he was neither required nor expected to inform his mother or Mr. Michener in advance of his acceptance.

¶25 A consenting occupant has common authority if (1) he or she could permit the search in his or her own right

---

[3] The record shows that Mr. White lived in the residence until he was 18 years old and again in 1999 and 2000, but not in 2003. He kept personal effects, his all-terrain-vehicle, and furniture in the house, irrigation room, and garage. He had full access to Janet's property without limitation as well as permission to be there whether she was present or not—and Mr. Michener knew it. He received quite a bit of mail at Janet's residence, and he was a frequent visitor. And Janet knew that Mr. White was often there when she was out of town.

Before remand, Mr. White claimed prejudice owing to the court's failure to enter findings of fact and conclusions of law. We will reverse for a trial court's failure to timely enter findings of fact and conclusions of law as required by CrR 3.6 if the appellant can establish that he was prejudiced by delay or that the findings and conclusions were tailored to meet the issues presented in the appellant's brief. *State v. Byrd*, 83 Wn. App. 509, 512, 922 P.2d 168 (1996). Mr. White does not expressly argue in his postremand brief that the findings were tailored. But the significant evidence of tailoring in this case is worth mentioning. Notably, the trial court did not review the two-year-old suppression transcripts before the hearing on the entry of the findings and conclusions. Instead, it accepted the facts as argued by the State in this appeal, presented in the form of proposed findings of fact and conclusions of law.

and (2) the nonconsenting party had assumed the risk that a cohabitant might permit a search.[4] *Morse*, 156 Wn.2d at 10 (citing *Mathe*, 102 Wn.2d at 543-44); *Thompson*, 151 Wn.2d at 804. However, the consent of a person who has common authority over the premises is valid only if the cohabitant is absent. *Thompson*, 151 Wn.2d at 803-04; *State v. Walker*, 136 Wn.2d 678, 682, 965 P.2d 1079 (1998). If the nonconsenting cohabitant is present and able to object, the police must also get his or her consent. *Thompson*, 151 Wn.2d at 803-04; *Walker*, 136 Wn.2d at 682; *Leach*, 113 Wn.2d at 744. Here, Mr. White was present and asserting his rights.

¶26 Relying on *Thompson*, 151 Wn.2d 793, the State argues that because Mr. White did not have the authority to consent to search in his own right, he could not object to a search. In *Thompson*, an officer serving a civil arrest warrant detected an odor he associated with methamphetamine. The defendant's father consented to a search of a boathouse on the property. The defendant lived in a trailer on the property and sometimes used the boathouse. Police did not seek the consent of the defendant, who lived in the trailer rent-free. The court concluded that the defendant did not have joint control because his access to the boathouse was contingent on his parents' permission. *Id.* at 806-07. Therefore, he did not have common authority and his permission was not necessary.

¶27 Here, both parties' access to the irrigation control room located on Janet's property was subject to Janet's permission. Even though Mr. Michener had business there,

---

[4] The State argues that cases that involve co-occupants or cohabitants do not apply to the facts before us. Relying on *Leach*, 113 Wn.2d 735, the State argues that *Leach* "requires that the party who is objecting to the search be a 'co-occupant' or 'cohabitant.'" Resp't's Br. at 6. *Leach* does not stand for that proposition. It holds that a "'mere property interest'" does not create common authority; rather it is based on "'joint access or control for most purposes.'" *Leach*, 113 Wn.2d at 739 (quoting *Matlock*, 415 U.S. at 171 n.7). This standard applies to common authority to search "'premises *or* effects.'" *Leach*, 113 Wn.2d at 739 (emphasis added) (quoting *Matlock*, 415 U.S. at 170). Cohabitants or co-occupants are merely examples of those with joint access or control. The authority concerning cohabitants and co-occupants applies equally to joint controllers and those with joint access.

his access could be revoked as readily as the access Janet granted to her son. In other words, either the family relationship or the business relationship could collapse, the consequences of which would be the revocation of previously granted licenses to enter the premises. Each party's access is contingent on the party's relationship with Janet.

¶28 Next, the State relies on *State v. Summers*, 52 Wn. App. 767, 770, 764 P.2d 250 (1988). In *Summers*, the court upheld as valid the consent given by the defendant's adult sister, who was acting not only as a baby-sitter but also as the head of household during their mother's four-day absence. In so doing, the court examined the conditions under which a parent may consent to the search of a child's room. *Id.* at 771-73. The State claims that Mr. Michener is in the position of a parent taking adult responsibility for the residence. The consenting party in *Summers* was asked to live in the house and take care of the children. *Id.* at 769. It is logical to find that she stepped into the mother's shoes as the head of household: she literally took her place. While Mr. Michener assumed some of Janet's chores, he by no means stepped into her shoes. He did not live there, and he never assumed control over Janet's adult son, Mr. White. *Summers* also involved the failure to obtain the consent of the juvenile who was not present at the time of the search. It is not controlling here.

¶29 The State also relies on *State v. Vy Thang*, 145 Wn.2d 630, 638-39, 41 P.3d 1159 (2002), which provides that "consent to search by a host is always effective against a guest within the common areas of the premises." The State seems to suggest that Mr. White was a guest of Mr. Michener, who was exercising control over a common area. Mr. Michener was not a host, but a third party. Janet was Mr. White's host.

¶30 The parties engage in a separate and lengthy analysis regarding Mr. White's expectation of privacy. The trial court addressed the issue on the merits rather than dismissing the motion for lack of standing. *Jones*, 146 Wn.2d at 332 (a defendant has no standing to challenge a search of

an item he does not own unless the defendant is entitled to assert automatic standing). Nor did the State seek dismissal of the appeal for Mr. White's lack of standing. *See* RAP 2.4(a).

¶31 Expectation of privacy is, however, relevant to the authority to control. *Morse*, 156 Wn.2d at 15. And our courts have consistently held that a temporary guest has an expectation of privacy in his or her host's residence. *State v. Rison*, 116 Wn. App. 955, 959, 69 P.3d 362 (2003); *State v. Rodriguez*, 65 Wn. App. 409, 415, 828 P.2d 636 (1992); *State v. Jungers*, 125 Wn. App. 895, 906, 106 P.3d 827 (2005). Of course, that expectation of privacy is qualified by the valid consent to search of another resident. *Rison*, 116 Wn. App. at 959; *Rodriguez*, 65 Wn. App. at 415; *Jungers*, 125 Wn. App. at 906; *see Leach*, 113 Wn.2d at 739 ("In essence, an individual sharing authority over an otherwise private enclave inherently has a lessened expectation that his affairs will remain only within his purview, as the other cohabitants may permit entry in their own right."). The consent issue has been fully addressed above.

¶32 The trial court made a factual finding that because Deputy Artz was "[c]oncerned that there may be a danger to people and the community, Deputy Artz wanted to make sure that nobody else was inside." CP at 103 (Finding of Fact 17). And it was not until after this thought process that he actually stepped inside the building. But in its legal conclusions, the trial court did not justify the deputy's entry as a part of his community caretaking duties.[5]

¶33 It appears from the findings that the deputy may have abandoned the authority of Mr. Michener's consent when he actually entered the premises, which would be proper under the circumstances where Mr. White was present and attempting to assert his right of control. In-

---

[5] The conclusions of law addressed consent to search and Mr. White's detention and arrest. Mr. White's appeal does not address his detention or arrest, except to the extent that he was removed rather than being allowed to assert his right to object to the search. And the State does not argue that Deputy Artz had probable cause to arrest Mr. White when he opened the irrigation room door.

stead, he looked through the open door and saw evidence of a methamphetamine manufacturing lab and decided to check it out.

¶34 Notably, the trial court unequivocally concluded that Mr. Michener's consent was used to justify the search in lieu of a warrant. Because the deputy improperly relied on Mr. Michener's consent to enter, we address the community caretaking exception as an alternate justification to the warrant requirement. *See State v. Williams*, 96 Wn.2d 215, 221, 634 P.2d 868 (1981) (reviewing erroneously labeled findings of fact to determine whether the evidence justified the legal conclusion). Nonetheless, the record does not support entry on the basis of community safety and shows only that the entry was related to a criminal investigation.

¶35 The community caretaking exception to the search warrant requirement allows for the limited invasion of constitutionally protected privacy rights when it is necessary for police officers to render aid or assistance or when making routine checks on health and safety. *Kinzy*, 141 Wn.2d at 386. This invasion is allowed only if (1) the police officer subjectively believed that someone likely needed assistance for health or safety concerns, (2) a reasonable person in the same situation would similarly believe that there was need for assistance, and (3) there was a reasonable basis to associate the need for assistance with the place being searched. *Id.* at 386-87. "Whether an encounter made for noncriminal noninvestigatory purposes is reasonable depends on a balancing of the individual's interest in freedom from police interference against the public's interest in having the police perform a 'community caretaking function.'" *Kalmas v. Wagner*, 133 Wn.2d 210, 216-17, 943 P.2d 1369 (1997).

¶36 Police involvement under this exception must be "'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *State v. Houser*, 95 Wn.2d 143, 151, 622 P.2d 1218 (1980) (emphasis omitted) (quoting *Cady v. Dombrowski*,

413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973)); *see also State v. Kypreos*, 115 Wn. App. 207, 217, 61 P.3d 352 (2002) (citing *Kinzy*, 141 Wn.2d at 385); *Thompson*, 151 Wn.2d at 802. A warrantless search is justified, for instance, "when premises contain persons in imminent danger of death or harm; objects likely to burn, explode, or otherwise cause harm; or information that will disclose the location of a threatened victim or the existence of such a threat." *State v. Downey*, 53 Wn. App. 543, 544-45, 768 P.2d 502 (1989).

¶37 There was no evidence that Deputy Artz had any concern for the safety of persons or property. In contrast to the lack of testimony to support the exception, there is ample evidence to support his intent to investigate his belief that Mr. White was engaged in ongoing criminal activity.

¶38 Deputy Artz testified that upon seeing Mr. White, "[I]n my 24 years as a law enforcement officer I have seen that look in a person[']s eyes that have been caught in the act."[6] RP (Apr. 13, 2004) at 65. When Mr. White told Deputy Artz he had a right to be there and refused to exit, the officer unholstered his weapon and told Mr. White that "it would be in his best interest to step out now." *Id.* at 66. He then placed Mr. White in his patrol car and told him he intended to find out what Mr. White was doing. And that is what he did: he returned to the irrigation room and looked inside and saw what he believed was a methamphetamine lab. But based on his limited experience and training with methamphetamine manufacturing—consisting mainly of a two-hour class—he was still uncertain at that point.

¶39 He did not apply for a warrant, nor did he call the drug task force as he was trained. Rather, he entered, stating that he wanted to make sure that there was nobody else there that he needed to detain. He said that he was not sure if there was a burglary, trespass, or exactly what was going on, given the smell. Deputy Artz was clearly investi-

---

[6] The defense objection to this testimony was sustained on the issue of the State's justification for the search on the theory of consent. But it is relevant to the deputy's subjective belief on the alternate community caretaking theory.

gating. He did not, however, testify to any community caretaking justification for the entry, nor does the record support one.

¶40 "When the State invokes [the community caretaking] exception, the reviewing court ' "must be satisfied that the claimed emergency was not simply a pretext for conducting an evidentiary search." ' " *State v. Schroeder*, 109 Wn. App. 30, 38, 32 P.3d 1022 (2001) (quoting *State v. Johnson*, 104 Wn. App. 409, 414, 16 P.3d 680 (2001) (quoting *State v. Lynd*, 54 Wn. App. 18, 21, 771 P.2d 770 (1989))). There is no assurance that the deputy's motives were not a pretext here.

¶41 The exceptions to the warrant requirement do not apply to the circumstances presented in this case. We therefore reverse the conviction.

KULIK, J., and KATO, J. PRO TEM., concur.