# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 46236-2 |
| Respondent, | |
| v. | |
| NORMAN GRANVEL ROONEY, | PUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — Norman Granvel Rooney appeals his convictions for three counts of unlawful possession of a controlled substance (methamphetamine, heroin, and clonazepam) and one count of first degree unlawful possession of a firearm. He argues that the trial court erred in denying his motion to suppress evidence of the controlled substances, which was found in his bedroom, and the firearm, which was found in his pants, because the search of his bedroom over his objection was unlawful, and the frisk of his pants was unlawful.

We hold that the search of Rooney's bedroom over his objection was unlawful, and the evidence of the controlled substances must be suppressed. Therefore, we reverse Rooney's convictions for unlawful possession of three controlled substances. However, we hold that the frisk of Rooney's pants was based on reasonable suspicion. Therefore, we affirm his conviction for first degree unlawful possession of a firearm. We reverse in part and affirm in part and remand with instructions for the trial court to dismiss the three counts of unlawful possession of a controlled substance and for further proceedings consistent with this opinion.

FACTS

Alexandria White, who was serving a term of community custody, began living in Rooney's home in December 2013 shortly after her release from prison.[1] Community Corrections Officer (CCO) Chris Napolitano supervised White's community custody. Napolitano had also supervised Rooney's previous community custody, which he had completed. As a result, Napolitano knew that in the past Rooney and White had lived together "like a married couple" and they had "always lived in the same room together." Verbatim Report of Proceedings (VRP) at 10. After White moved in with Rooney again that December, Napolitano became aware that White had changed her address without notifying him, which violated her community custody conditions. Napolitano learned of her whereabouts from another probationer that he supervised, Thomas DeClue, who also lived with Rooney in the same house.

Napolitano obtained an arrest warrant for White and, with a team of law enforcement officers, went to Rooney's house to arrest her on December 30, 2013. DeClue answered Napolitano's knock, and he pointed to a bedroom next to the front door when Napolitano asked to speak to White. As Napolitano walked into the bedroom, White was standing in the bedroom with Rooney, who appeared to be asleep in bed. Napolitano saw a pink backpack, a purse, and a baby carrier in the bedroom. Another officer, Keenan Harvey, noticed female clothes and a purse in the bedroom. White's infant child was on the bed. Napolitano observed swords and axes hanging on the bedroom wall and a couple of knives laying on the shelves. He observed additional weapons

---

[1] White reviewed and signed the form detailing the requirements of her community custody terms and conditions, which included the requirement to notify her community corrections officer of any change in her address.

on Rooney's nightstand. Napolitano advised White that by failing to report her new address and not being available for contact she had violated her community custody. VRP at 13. White acknowledged that she knew she should have updated her address with Napolitano and that Napolitano would arrest her for the violation.

After Napolitano arrested White and placed her in the living room, Napolitano told White that he was going to search the bedroom. White responded that she lived in the living room, not the bedroom, but Napolitano did not see any sleeping arrangements or anything that appeared to be White's belongings in the living room. When Napolitano asked about her relationship with Rooney, White responded that they were "trying to work it out." VRP at 20-21.

Napolitano ordered Rooney to leave the bedroom so the officers could search it. Rooney objected to the search because he was not currently on community custody, but he began to physically comply. Rooney, who was dressed in what appeared to be boxer shorts, asked to put on pants. Napolitano replied that he would have to search the pants "for safety reasons" before Rooney could put them on and leave the room. Clerk's Papers (CP) at 30 (Finding of Fact (FF) 18). Given the other weapons in the room, Napolitano was concerned that Rooney might have a weapon in the pants. Rooney grabbed a pair of pants, and when Napolitano took hold of the pants, he immediately felt a firearm.

After Rooney was arrested and placed in the living room, Napolitano and Harvey searched the bedroom and found methamphetamine, heroin, and clonazepam. The State charged Rooney with three counts of unlawful possession of a controlled substance (methamphetamine, heroin, and clonazepam) and one count of first degree unlawful possession of a firearm. Rooney moved to

suppress evidence of the controlled substances and the firearm. The trial court denied Rooney's motion.

The trial court found Rooney guilty as charged after a stipulated facts trial. Rooney appeals his convictions, arguing that the trial court erred when it denied his motion to suppress.

ANALYSIS

I. LEGAL PRINCIPLES

We review a trial court's denial of a motion to suppress evidence to determine whether substantial evidence supports the trial court's findings of fact and whether those findings of fact support the trial court's conclusions of law, which we review de novo. *State v. Russell*, 180 Wn.2d 860, 866-67, 330 P.3d 151 (2014). Substantial evidence is evidence that is sufficient to persuade a fair-minded person of the truth of the stated premise. *Russell*, 180 Wn.2d at 866-67. Unchallenged findings of fact are verities on appeal. *State v. Bonds*, 174 Wn. App. 553, 562, 299 P.3d 663, *review denied* 178 Wn.2d 1011 (2013).

Warrantless searches and seizures are generally per se unreasonable and violate the Fourth Amendment of the United States Constitution and article I, section 7 of the Washington Constitution. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). "'[A] few jealously and carefully drawn exceptions'" apply to the general rule against warrantless searches and seizures. *Garvin*, 166 Wn.2d at 249 (quoting *State v. Duncan*, 146 Wn.2d 166, 171-72, 43 P.3d 513 (2002)). Consent is one well-recognized exception to this rule. *State v. Cantrell*, 124 Wn.2d 183, 187, 875 P.2d 1208 (1994). The State bears the burden of proving by clear and convincing evidence that a warrantless search falls into one of the exceptions to the warrant requirement. *State v. Morse*, 156 Wn.2d 1, 7, 123 P.3d 832 (2005).

## II. THE SEARCH OF ROONEY'S BEDROOM WAS UNLAWFUL

Rooney argues that the trial court erred in denying his motion to suppress evidence of the controlled substances found in his bedroom because he did not consent to the search. We agree.

Under RCW 9.94A.631(1),[2] a CCO may require a probationer to submit to the search of his or her residence if the CCO has a well-founded suspicion that the person has violated a condition of his or her community custody sentence.[3] *State v. Winterstein*, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009). RCW 9.94A.631(1) technically does not create an exception to the warrant requirement. Instead, it requires the probationer to consent to a search, and consent is an exception to the search warrant requirement. *Cantrell*, 124 Wn.2d at 187. Requiring a probationer to consent to a warrantless search is reasonable because a person serving a community custody sentence has a lesser expectation of privacy. *Winterstein*, 167 Wn.2d at 628. It is undisputed that White was a probationer under the Department of Correction's supervision, she had violated a term of her

---

[2] RCW 9.94A.631(1) provides in relevant part that "[i]f there is reasonable cause to believe that an offender has violated a condition or requirement of [community custody], a [CCO] may require an offender to submit to a search and seizure of the offender's person, residence, automobile, or other personal property."

[3] A CCO must also have probable cause to believe that the probationer lives at the residence to be searched. *Winterstein*, 167 Wn.2d 620, 630, 220 P.3d 1226 (2009). Rooney argues that the search of his bedroom was unlawful because the officers did not have probable cause to believe that White resided in his bedroom. Because we hold that the search was unlawful because of Rooney's objection, we do not address this issue.

Rooney also challenges the trial court's findings of fact 6 and 7: (1) that Napolitano found White "inside" Rooney's bedroom; and (2) that Napolitano and Harvey saw a purse, a pink backpack, and other baby items that "appeared to belong to Ms. White" in the bedroom. CP at 29 (FF 6, 7). Because we reverse based on the trial court's legal error, we do not address these challenges.

community custody, a valid arrest warrant was issued for her arrest under RCW 9.94A.631(1), and she knew she would be arrested.

The issue here, however, is whether *Rooney*, as a cohabitant, had a right to object to a search of the bedroom that he shared with White.[4] In searches involving a cohabitant who consents to a warrantless search, Washington has adopted the common authority rule, which provides that a cohabitant may grant consent to search a residential area that each cohabitant has equal authority to control. *Morse*, 156 Wn.2d at 7-8, 10. This rule is based on the Washington Constitution's guarantee of each individual's expectation of privacy and the theory that a person assumes risk that his or her cohabitant may allow "outsiders" into a shared space. *Morse*, 156 Wn.2d at 7. Cohabitants also "impliedly agreed" to allow their cohabitants to waive their constitutional right to privacy by consenting to an officer's search of the shared space. *Morse*, 156 Wn.2d at 7-8. This implied agreement makes the common authority rule derivative of the consent exception to the warrant requirement. *See Morse*, 156 Wn.2d at 7-8.

A cohabitant's authority to consent to a warrantless search of a shared residential space is not absolute. A cohabitant with equal or greater control over the place to be searched may validly consent to a warrantless search if none of the other cohabitants are present and object to the search. *Morse*, 156 Wn.2d at 15. The consent of only one person with common authority over the place to be searched when multiple cohabitants are present, however, is not sufficient to conduct a lawful search of shared space. *State v. White*, 141 Wn. App. 128, 138, 168 P.3d 459 (2007). "We have never held that a cohabitant with common authority can give consent that is binding upon another

---

[4] The parties do not dispute that Rooney had equal or greater control over the bedroom and thus he had "common authority" over it. *Morse*, 156 Wn.2d at 15.

cohabitant with equal or greater control over the premises when the nonconsenting cohabitant is actually present on the premises." *Morse*, 156 Wn.2d at 13.

The State relies on RCW 9.94A.631(1) to argue that the officers' search of Rooney's bedroom was lawful because White was a probationer who had violated a term of her community custody and who resided in Rooney's bedroom. We disagree because a probationer's diminished expectation of privacy does not apply to his or her cohabitants. RCW 9.94A.631(1) does not diminish Rooney's individual right to not "be disturbed in his private affairs, or his home invaded, without authority of law." CONST. art. I, § 7.

The facts of this case are analogous to an officer who seeks consent to a warrantless search of a residence from one cohabitant with common authority, but another cohabitant with common authority who is present at the time objects to the search. Under RCW 9.94A.631(1), Napolitano, as White's CCO, could require White to consent to a warrantless search of her residence. Under *Morse*, even if White had consented, once Rooney objected to the warrantless search there is no question that the officers' search would have been unlawful. *Morse*, 156 Wn.2d at 13; *see also Georgia v. Randolph*, 547 U.S. 103, 122-23, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006) ("[A] physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant."). The State's reliance on RCW 9.94A.631(1) for

authority to search Rooney's bedroom due to White's status as a probationer does not diminish Rooney's individual right to privacy under the Washington Constitution.

The common authority doctrine provides that cohabitants assume the risk that a cohabitant may grant consent to search. *Morse*, 156 Wn.2d at 7-8. That assumption, however, applies only when the nonconsenting party is not "present and able to object." *White*, 141 Wn. App. at 138. Rooney was present and objected to the search. CP at 30 (FF 15). "When a cohabitant who has equal or greater authority to control the premises is present, his consent must be obtained and the consent of another of equal or lesser authority is ineffective against the nonconsenting cohabitant." *Morse*, 156 Wn.2d at 15.

Under application of the common authority rule, because Rooney was present and objected, the officers' search of Rooney's room was unlawful. *White*, 141 Wn. App. at 138. The fact that White was serving a community custody term does not undermine Rooney's right to object to a warrantless search of his bedroom. Therefore, the officers' warrantless search of Rooney's bedroom was unlawful as to Rooney, and the trial court erred in denying Rooney's motion to suppress the methamphetamine, heroin, and clonazepam evidence found during the unlawful search.

### III. VALID FRISK OF ROONEY'S PANTS

Rooney next challenges findings of fact 11 and 17 and conclusions of law 3 and 4, which relate to the lawfulness of Napolitano's frisk of Rooney's pants while in his bedroom. Substantial evidence supports the trial court's challenged findings of fact, and the trial court properly concluded that Napolitano conducted a valid frisk of Rooney's pants. Thus, the trial court did not err in denying Rooney's motion to suppress evidence of the firearm found in Rooney's pants.

8

A.  FINDINGS OF FACT

Rooney challenges findings of fact 11 and 17, in which the trial court found that (1) Napolitano and Harvey saw "several swords, an axe, and multiple knives" in Rooney's bedroom and (2) because he was "aware of the number of weapons," Napolitano was "concerned for his safety."  CP at 29-30 (FF 11, 17).  Substantial evidence supports both of these challenged findings of fact.

Napolitano testified that when he entered Rooney's bedroom he noticed "swords and axes on the wall, [and] a couple knives . . . on the shelves."  VRP at 15.  He observed additional weapons on Rooney's nightstand.  Napolitano further testified that when Rooney asked to put on pants, Napolitano replied that they would have to be searched first because "I'm not going to get shot here."  VRP at 22.  During his testimony, Napolitano explained that he was concerned that Rooney might have had a weapon in the pants given the weapons that Napolitano had observed in plain view.  Substantial evidence supports the trial court's findings of fact that Napolitano observed weapons in plain view in Rooney's bedroom and that these weapons caused Napolitano to be concerned for the officers' safety when Rooney was asked to put on pants.  Therefore, Rooney's challenges to findings of fact 11 and 17 fail. [5]

---

[5] In addition to his other assignments of error, Rooney challenges finding of fact 21, which states that the trial court did not find the defense witnesses credible.  Because the trial court, not the appellate court, considers credibility of witnesses and weighs evidence, we will not second guess the trial court's determination that Rooney's witnesses were not credible.  *State v. W.R.*, 181 Wn.2d 757, 770, 336 P.3d 1134 (2014).

B. CONCLUSIONS OF LAW

Rooney argues that the trial court erred in concluding in conclusions of law 3 and 4 that Napolitano's frisk of his pants was lawful because Napolitano lacked reasonable suspicion to conduct a valid frisk. We disagree.

An officer may conduct a nonconsensual protective *Terry*[6] frisk for weapons if the officer can articulate specific facts that create an objectively reasonable belief that the person is armed and dangerous. *State v. Harrington*, 167 Wn.2d 656, 667, 222 P.3d 92 (2009). The officer need not be certain that the person is armed before he or she conducts a protective frisk. *Harrington*, 167 Wn.2d at 667-68. We are reluctant to substitute an officer's judgment in the field for our own. *Harrington*, 167 Wn.2d at 668. "'A founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing.'" *Harrington*, 167 Wn.2d at 668 (emphasis omitted) (quoting *State v. Belieu*, 112 Wn.2d 587, 601-02, 773 P.2d 46 (1989)).

The trial court's findings of fact 11 and 17 support its conclusions of law 3 and 4 that Napolitano's frisk of Rooney's pants was based upon specific and objective facts that led to a reasonable suspicion that Rooney may have been armed. Napolitano noticed "several swords, an axe, and multiple knives" in Rooney's bedroom and these weapons made him concerned for the officers' safety. CP at 29-30 (FF 11, 17). Further, Rooney does not challenge the trial court's finding of fact 18, in which the trial court found that Napolitano told Rooney that the pants would

---

[6] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

be searched for weapons "for safety reasons" before he could put them on. CP at 30 (FF 18). Rooney also does not challenge finding of fact 19, in which the trial court found that Rooney then "openly grabbed his pants" after Napolitano told him he would search the pants that Rooney wanted to wear. CP at 30 (FF 19).

Rooney's behavior following Napolitano's warning that the pants would be searched, together with Napolitano's observation of the weapons in plain view in his bedroom, gave Napolitano articulable suspicion that the pants Rooney wanted to wear might have contained a weapon. The trial court did not err in concluding that Napolitano had a reasonable objective belief that Rooney may have had a firearm in his pants and that Napolitano's protective search was lawful. Therefore, the trial court properly denied Rooney's motion to suppress the firearm evidence.

CONCLUSION

The officers' warrantless search of Rooney's bedroom over his objection was unlawful, and therefore, we hold that the evidence of the controlled substances must be suppressed. But Napolitano's frisk of Rooney's pants was lawful and based on reasonable suspicion. Thus, we reverse Rooney's three convictions for unlawful possession of a controlled substance (methamphetamine, heroin, and clonazepam), and we affirm his conviction for first degree

No. 46236-2-II

unlawful possession of a firearm. We reverse in part and affirm in part and remand with instructions for the trial court to dismiss the three counts of unlawful possession of a controlled substance and for further proceedings consistent with this opinion.

SUTTON, J.

We concur:

MAXA, P.J.

LEE, L.