[No. 25332-5-III.   Division Three.   June 26, 2008.]

THE STATE OF WASHINGTON, *Appellant*, v. JACOB STERLING HOUVENER, *Respondent*.

*Denis P. Tracy, Prosecuting Attorney*, and *Byron Bedirian, Deputy*, for appellant.

*Timothy H. Esser* (of *Libey, Ensley, Esser & Nelson*), for respondent.

¶1 SCHULTHEIS, C.J. — Jacob Sterling Houvener, a student at Washington State University, was charged with residential burglary. Relying on his Fourth Amendment presentation, the trial court suppressed the State's evidence.[1] We conclude that the evidence was properly suppressed because it was unlawfully obtained by police when an officer conducted a building-wide search of the interior hallways of the dormitory without a warrant. We therefore affirm.

## FACTS

¶2 According to the trial court's unchallenged findings of fact, at about 5:45 a.m. on February 11, 2006, Washington State University Police Officer Matthew Kuhrt responded to a reported burglary on the third floor of the East Tower of the Stephenson dormitory complex. Salman Islman, a resident of room 323, reported waking up and seeing someone leave his room. Mr. Islman told the officer that his laptop computer and acoustic guitar were missing.

¶3 Officer Kuhrt left Mr. Islman's room and initiated a search of the dormitory complex. Officer Kuhrt started on

---

[1] Because Mr. Houvener did not below, and does not on appeal, rely on article I, section 7 of the Washington State Constitution, the analysis is confined to Fourth Amendment imperatives.

the top of the complex, either the 12th or 13th floor, and walked the halls, descending eventually to the 6th floor.

¶4 Mr. Houvener and Jerid Scott Sturman-Camyn were in Mr. Houvener's room on the sixth floor. As he approached Mr. Houvener's door, Officer Kuhrt reported hearing music and voices, which he deemed suspicious given the early hour. He listened at the threshold of the door and "heard one voice say, 'I'm just paranoid we are going to get caught' and a second voice say, 'I don't think he would call the cops.' " Clerk's Papers (CP) at 45 (Finding of Fact 3). Officer Kuhrt put his finger over the peephole to prevent the occupants from seeing who was there and knocked while stating, " 'let me in, this is Matt.' " CP at 45 (Finding of Fact 4). The students inside ignored the knock and did not answer the door. Officer Kuhrt attempted this ruse at least once more, to no avail.

¶5 Officer Kuhrt eventually removed his finger from the peephole, knocked and identified himself as a police officer, and ordered the occupants to open the door. Mr. Houvener opened the door.

¶6 Officer Kuhrt, dressed in his police uniform and armed with a visible pistol, asked Mr. Houvener to step out in the hallway and to walk down the hall with him. Mr. Houvener complied. As Officer Kuhrt questioned Mr. Houvener, he made incriminating statements to the effect that he had some items in his room that did not belong to him. Meanwhile, Mr. Sturman-Camyn, who was also a resident of that floor but not a roommate of Mr. Houvener's, was also asked out of Mr. Houvener's room and questioned by another officer. Mr. Sturman-Camyn likewise made incriminating statements. The statements given by the students were made without the benefit of *Miranda* warnings.[2]

¶7 After Mr. Houvener made his incriminating statements, he was placed under arrest and advised of his *Miranda* rights. He was then asked to retrieve from his

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

room the items stolen in the burglary, which he did. The request was not preceded by *Ferrier* warnings.[3] The police did not have permission from Mr. Houvener or from any resident of the sixth floor to enter and search the sixth floor.

¶8 Mr. Houvener shares a bathroom, which is located across the hall from his room, with the other residents of his floor. He also shares a study lounge with other residents of the sixth floor. Each floor of Stephenson has a common bathroom and study lounge. Each floor of Stephenson East is limited to one sex. The sixth floor is a male floor; it has no women's bathroom.

¶9 While the lobby to the Stephenson East dormitory can be accessed by the general public, one cannot access any of the floors unless he or she is a resident with a special pass-key or is the escorted guest of a resident. Nevertheless, Washington State University (WSU) housing authorities have issued passkeys to the police. The police conduct walk-through inspections of the dormitory hallways without having been invited by a resident and without having received the consent of any resident. These patrols occasionally uncover evidence of criminal behavior, i.e., minor drinking or smoking marijuana, which leads to further investigation and warrantless searches and/or arrests.

¶10 The trial court noted that WAC 504-24-020(2)(d) provides, " 'All guests must be escorted while in the building.' " CP at 47 (Finding of Fact 16). "Guests are defined as anyone not residing in the residence hall." Former WAC 504-24-020(2)(e) (1987).[4] "Each living group is permitted to develop its own visitation schedule for its main lounge and

---

[3] *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998).

[4] After this case was decided by the trial court, the regulation was changed to read, "Except for those persons authorized access by WAC 504-24-025, guests are defined as anyone not residing in the residence hall." WAC 504-24-020(2)(e) (Order 06-23-158, filed Nov. 22, 2006, effective Dec. 23, 2006). A companion regulation, WAC 504-24-025, also effective December 23, 2006, was added to provide, "University administrators or designees, officers, agents, or employees whose duties include working with residence hall residents or programs, performing custodial, maintenance, or operations of residence halls, or performing safety, emergency, security, police, or fire protection services shall have access to residence halls at all times while in the performance of their assigned duties." We

lobbies." WAC 504-24-020(3). But visitors are not allowed between 2 a.m. and 6:30 a.m. *Id.*

¶11 The trial court entered the following conclusions of law:

1. The Defendant had a reasonable expectation of privacy in the corridor/hallway of his dormitory floor, which he did not waive and which privacy interest was violated by the unconsensual, warrantless entry therein by WSU Police. See *State v. Dalton*, 43 Wn. App. 279[, 716 P.2d 940] (1986), *People v. Killebrew*, 76 Mich. App. 215, 256 NW 2d 581 (1977), and *Reardon v. Wroan*, 811 F.2d 1025 (7th Cir. 1987).

2. Officer Kuhrt's eavesdropping at the threshold of Defendant's dormitory room constituted an unconsensual, warrantless search. *See, State v. Ortiz*, 257 Neb. [784], 600 NW 2d 805 (1999), and [*United States*] *v. Case*, 435 F.2d 766 [(7th Cir. 1970)].

3. Officer Kuhrt's entry and search of the sixth floor hallway violated WAC 504-24-020, because this area is part of the defendant's residence.

4. A private citizen could not have legally entered the sixth floor of the Defendant's dorm, uninvited, and eavesdropped at the threshold to his room. Consistent with *State v. Seagull*, 95 Wn.2d 898[, 902, 632 P.2d 44] (1981), the police had no greater right, absent a warrant or consent, than a private citizen to act in the manner they did.

5. Officer Kuhrt had no legal authority to order Defendant to open his door. Such order constituted a warrantless, unconsensual search/seizure contrary to Article I, Section 7 of the Washington State Constitution and the Fourth Amendment of the United States Constitution. All evidence obtained thereafter should be considered fruit of the poisonous tree. Had the Defendant not been ordered to open his door, he would not have agreed to exit his room, be interviewed by the police, give incriminating statements

---

decline to comment on the effect, if any, these new regulations would have on our decision.

and thereafter, turn over to the police the stolen guitar and computer.

CP at 47-48.

¶12 Based on these findings and conclusions, the trial court suppressed the evidence. Because the State stipulated that without the evidence obtained from Mr. Houvener's room this prosecution could not proceed, the case against Mr. Houvener was dismissed with prejudice. The State appeals.

## ANALYSIS

¶13 Because the State did not challenge the trial court's findings of fact, the findings are viewed as verities. *State v. Moore*, 161 Wn.2d 880, 884, 169 P.3d 469 (2007). We review the trial court's conclusions of law de novo. *Id.* at 885.

¶14 A search occurs under the Fourth Amendment only if the government intrudes upon a subjective expectation of privacy that society is willing to recognize as objectively reasonable. *Katz v. United States*, 389 U.S. 347, 351-52, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); *State v. Young*, 123 Wn.2d 173, 181, 867 P.2d 593 (1994). Whether a search or seizure is unreasonable, within the meaning of the Fourth Amendment, depends upon the facts and circumstances of each case. *Cooper v. California*, 386 U.S. 58, 59, 87 S. Ct. 788, 17 L. Ed. 2d 730 (1967) (citing *Preston v. United States*, 376 U.S. 364, 366-67, 84 S. Ct. 881, 11 L. Ed. 2d 777 (1964)). That determination entails a two-part inquiry: first, whether the individual has exhibited an actual subjective expectation of privacy and, second, whether that expectation is one society recognizes as reasonable. *Katz,* 389 U.S. at 361.

¶15 In construing the Fourth Amendment's proscription against unreasonable searches and seizures, the general rule has been that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a

valid search warrant." *Camara v. Mun. Court*, 387 U.S. 523, 528-29, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967) (citing *Stoner v. California*, 376 U.S. 483, 84 S. Ct. 889, 11 L. Ed. 2d 856 (1964)).

¶16 The State argued before the trial court that no search occurred because students do not enjoy a reasonable expectation of privacy in their hallways. Mr. Houvener argued, and the court agreed, that because each dormitory floor is treated by the university as an independent residential area and students are members of a living group—with shared bathroom, study facilities, lobbies, and hallways for which the residents are responsible and may govern—he had a subjective expectation of privacy that is objectively reasonable.

¶17 An individual has a privacy interest in the interior of his or her home. *E.g.*, *Payton v. New York*, 445 U.S. 573, 589-90, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *Ferrier*, 136 Wn.2d 103. This privacy interest extends to other types of residences, even temporary ones. *E.g.*, *Stoner*, 376 U.S. at 490 (hotel rooms); *State v. Davis*, 86 Wn. App. 414, 419, 937 P.2d 1110 (1997) (motel rooms); *McDonald v. United States*, 335 U.S. 451, 69 S. Ct. 191, 93 L. Ed. 153 (1948) (room in a boarding house). And it applies to university students' dormitory rooms. *Houck v. Univ. of Wash.*, 60 Wn. App. 189, 199, 803 P.2d 47 (1991) (applying WASH. CONST. art. I, § 7); *Piazzola v. Watkins*, 442 F.2d 284, 289 (5th Cir. 1971) ("a student who occupies a college dormitory room enjoys the protection of the Fourth Amendment"); *see also Anobile v. Pelligrino*, 303 F.3d 107, 120-21 (2d Cir. 2001) (administrative search for drugs in horse race employees' dormitories located on the racetrack was unconstitutional).

¶18 In assessing Mr. Houvener's privacy interest in his living group hallway, the focus is whether, under the circumstances, the hallway should be placed under the home's "'umbrella' of Fourth Amendment protection." *United States v. Dunn*, 480 U.S. 294, 301, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987) (addressing curtilage). The curtilage has been considered "part of the home itself for Fourth Amendment

purposes." *Oliver v. United States*, 466 U.S. 170, 180, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984).

¶19 The trial court held that Mr. Houvener had a reasonable expectation of privacy in his living group floor. We agree with the trial court's thoughtful analysis. The trial court cited three cases in its legal conclusion: *Dalton*, 43 Wn. App. 279; *Killebrew*, 76 Mich. App. 215; and *Reardon*, 811 F.2d 1025.

¶20 In *Reardon*, Delta Chi fraternity members at Illinois State University filed a civil rights lawsuit against law enforcement officers' warrantless entry into their fraternity house. The first question the court easily disposed of was "whether the hallway to the fraternity house where the plaintiffs were arrested is comparable, under a Fourth Amendment analysis, to the common areas of apartment buildings where cases have held that privacy interests are not protected." *Reardon*, 811 F.2d at 1027 n.2. The Seventh Circuit held, "Although there are certain similarities to the apartment building cases, fraternity residents clearly have a greater expectation of privacy in the common areas of their residence than do tenants of an apartment building." *Id.*

¶21 The circuit court agreed with the district court's observation that, unlike apartment dwellers who are "simply co-tenants sharing certain common areas," the fraternity members were more like " 'roommates in the same house.' " *Id.* (quoting record). The court also found that the fraternity's intended "exclusive living arrangement" had a goal of "maximizing the privacy of its affairs." *Id.*

¶22 While the application process for a dormitory living group is presumably less rigorous than for fraternities, the physical layout of the premises in *Reardon* is similar to the sixth floor of Stephenson East. As the court found, the residents of the sixth floor share a study area and bathroom, and they are viewed as a living group independent of residents of other floors. While outsiders can access the lobby, they may not access any of the floors without a pass-

key or without the escort of a resident of that floor. WAC 504-24-020(2)(d), (3).

¶23 Thus, similar to the fraternity members in *Reardon*, Mr. Houvener had an expectation of privacy in the hallway, to the exclusion of residents of Stephenson East's other floors or other outsiders. *Accord People v. Taylor*, 92 Misc. 2d 29, 30, 399 N.Y.S.2d 575 (Crim. Ct. 1977) (holding that an intoxicated person lying "with half of his body on the stoop and half in the inner hallway of a two-family house" was in his home because the hallway and porch were not public places and were part of the curtilage).

¶24 Because of the intimate nature of the activities in the hallway—most remarkably, towel-clad residents navigating the hallways to and from the shared shower facilities—it is reasonable to hold that this area is protected. *See, e.g., Hester v. United States*, 265 U.S. 57, 59, 44 S. Ct. 445, 68 L. Ed. 898 (1924) (distinguishing between "open fields" and "curtilage," the latter of which is traditionally defined as the area immediately surrounding the home, into which its intimate activities extend); *see also State v. Merritt*, 120 N.C. App. 732, 740, 463 S.E.2d 590 (1995) (affirming residential burglary conviction where "the intruders traversed the hallways, stairs, foyer, and dining room of the sorority house—all common areas of the house within the curtilage of the [caretaker's] apartment").

¶25 In *Killebrew*, the Michigan appellate court held that a hallway shared by tenants in a private, multiple-unit dwelling is not a public place. *Killebrew*, 76 Mich. App. at 218. The court stated that since entry was limited by right to occupants of the building and their guests, the occupants could expect a high degree of privacy in that area. The same is true here.

¶26 Finally, in *Dalton*, a WSU student invited an undercover officer into her college dormitory to conduct an illegal drug transaction. *Dalton*, 43 Wn. App. at 284-85. The warrantless entry was upheld as nonintrusive since police were invited in and took nothing except what would have been taken by a willing purchaser. The court noted, "The

purpose of WAC 504-24-020 is not to protect the defendants' illegal business, but rather *to protect the privacy of dorm residents from members of the general public* who have no reason to be in the dorm." *Id.* at 285 (emphasis added). Since the defendant invited the undercover officer into her room, she waived her right to privacy because she invited police inside, and her expectation of privacy was diminished by opening her home to outsiders for illegal drug sales. *Id.* at 286-87 (citing *Lewis v. United States*, 385 U.S. 206, 211, 87 S. Ct. 424, 17 L. Ed. 2d 312 (1966)).

¶27 The State argues that there is no reason to protect Mr. Houvener with the same WAC that the court refused to employ to protect the defendant in *Dalton*. Here, however, Mr. Houvener did not waive his right to privacy. Unlike in *Dalton*, the officers here were not invited by any student resident of the sixth floor and those student residents did not extend an invitation to engage in commerce.

¶28 The State also argues that using the WAC to exclude police would render the regulation meaningless because it would also prohibit entry by janitorial staff and WSU residential officials unless accompanied by a resident. We disagree. The dormitory support staff have implied permission to enter. *See Stoner*, 376 U.S. at 488-90 (refusing to expand the implied permission to enter given by motel guests to motel staff, such as maids, janitors, or repair persons, to provide motel management the authority to consent to warrantless searches).

¶29 The sixth floor student residents have a right to privacy in the hallway they share. These students are not strangers—they share close quarters, intimate spaces, and a common academic and social experience. This distinguishes their status from tenants in an apartment building. That the university allows the students in each living area to independently govern their common areas evinces an understanding of this private and synergic environment. It follows that the students in each living area have a common interest in the maintenance of their privacy.

¶30 The court also held that the police were not lawfully present in the student residents' sixth floor living area because the police had no greater right, absent a warrant or consent, than a private citizen to act in the manner that they did. We agree.

¶31 Washington courts have refused to recognize a privacy interest in those areas of the curtilage that are impliedly open to the public. "An officer with legitimate business, when acting in the same manner as a reasonably respectful citizen, is permitted to enter the curtilage areas of a private residence which are impliedly open, such as access routes to the house." *State v. Ross*, 141 Wn.2d 304, 312, 4 P.3d 130 (2000) (citing *Seagull*, 95 Wn.2d at 902). Here, under *Dalton*, Officer Kuhrt was not on legitimate business. Moreover, the early hour of the entry was one "when no reasonably respectful citizen would be welcome absent actual invitation or an emergency." *Id.* at 314.

¶32 The State argues that the search was justified by Mr. Islman's consent because he had common authority over the common areas within the dormitory building. Mr. Houvener notes that the State did not attempt to justify the search to the trial court on a consent theory. The State does not dispute its failure to raise the issue below or argue the issue in a reply brief.

¶33 A party may not generally raise a new argument on appeal that the party did not present to the trial court. *In re Det. of Ambers*, 160 Wn.2d 543, 557 n.6, 158 P.3d 1144 (2007). While the reviewing court has the discretion to address the issue, " 'we are not bound to do so and usually refuse.' " *Id.* (quoting *Smith v. Shannon*, 100 Wn.2d 26, 38, 666 P.2d 351 (1983)); *see also City of Spokane v. Whitehead*, 128 Wn. App. 145, 149, 115 P.3d 336 (2005) ("RAP 2.5(a) applies to the state as well as defendants: we will not review a challenge to a court ruling that was not raised at the proper time." (citing *State v. Espinoza*, 112 Wn.2d 819, 823, 774 P.2d 1177 (1989))).

¶34 The argument should not be addressed when, as here, the opposing party does not have an opportunity to develop the record in order to defend the new theory presented on appeal. *Ambers*, 160 Wn.2d at 557 n.6. We will address the argument, to the extent it can be reviewed with the record before us. But the record does not support either of the State's contentions (1) that Officer Kuhrt obtained Mr. Islman's consent to search or (2) that Mr. Islman had common authority.

¶35 First, as to obtaining consent, Mr. Islman did not testify. When describing his contact with Mr. Islman, Officer Kuhrt testified:

> I got the information from him as to the items, the amount of the items, cost of the items, and gave him my business card with the case number and, you know, *told him I'm going to*, you know, check the floor or *check the dorm* to see if I can find the items or any evidence of the items.

Report of Proceedings (RP) at 38 (emphasis added).

¶36 While the record shows that he stated his *intention* to search, Officer Kuhrt did not seek Mr. Islman's *permission* to search. Officer Kuhrt implied that he was "let in" to the building and could engage in a floor-to-floor search based on that invitation. RP at 55. This conflicts with Officer Kuhrt's clear testimony that he let himself in with a passkey provided by the university and unilaterally decided to search the dormitory for evidence.

¶37 Second, the court's findings and the record do not support the State's claim that Mr. Islman had common authority. The record shows that the student residents of each floor—which the university refers to collectively as a living group—have the authority to independently promulgate rules concerning visiting hours. WAC 504-24-020(3). Each living group may also decide how to decorate the hallway. And each living group is collectively responsible for damages to the floor if individuals responsible for the damage are not identified.

¶38 Because Mr. Islman is a member of a different living group than Mr. Houvener, he did not have common authority over that floor.

¶39 We conclude that Mr. Houvener had a reasonable expectation of privacy that was not vitiated by Mr. Islman's consent; we therefore need not address the remainder of the trial court's legal conclusions.

¶40 As the trial court held, in the absence of an exception to the warrant requirement, any evidence seized or derived from the illegal search should be suppressed under the exclusionary rule and under the fruit of the poisonous tree doctrine. *State v. Gaines*, 154 Wn.2d 711, 716-17, 116 P.3d 993 (2005) (citing *State v. Ladson*, 138 Wn.2d 343, 359, 979 P.2d 833 (1999); *State v. O'Bremski*, 70 Wn.2d 425, 428, 423 P.2d 530 (1967) (citing *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963))).

## CONCLUSION

¶41 The police in this case had no legal authority to enter Mr. Houvener's sixth floor living area where he enjoyed an objectively reasonable expectation of privacy. The evidence derived or seized as a result was properly suppressed.

¶42 Affirmed.

Sweeney, J., concurs.

¶43 Brown, J. (concurring in result) — Considering Washington State University historically has given pass-keys to the police and allowed walk-through inspections of the dormitory hallways without invitation from dormitory residents, I do not agree with Jacob Houvener that Officer Matt Kuhrt lacked legal authority to enter his dormitory hallway. Clothed with this authority, police have routinely been present in dormitory hallways. Thus, student resi-

dents lack the requisite expectation of privacy to exclude police and safety personnel. WAC 504-24-025 now recognizes this historical presence and spells out the commonsense need to allow persons "performing safety, emergency, security, police, or fire protection services" to "have access to residence halls at all times while in the performance of their assigned duties." Therefore, I do not agree with reasoning that police were unlawfully present on Mr. Houvener's dormitory floor as the basis for affirming the trial court's evidence suppression order.

¶44 Nevertheless, I concur in the result because generally Officer Kuhrt lacked legal authority to eavesdrop at Mr. Houvener's door or order him to open the door to collect evidence without a search warrant. *State v. Ross*, 141 Wn.2d 304, 312, 4 P.3d 130 (2000) (stating the general requirement for a warrant). Further, Officer Kuhrt's ruse, order, and exchange with Mr. Houvener do not meet the knock and talk standards of *State v. Ferrier*, 136 Wn.2d 103, 115, 960 P.2d 927 (1998).