# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  48540-1-II |
| Appellant, | PART PUBLISHED OPINION |
| v. | |
| WILLIAM PIPPIN, | |
| Respondent. | |

BJORGEN, C.J. — The State appeals the trial court orders suppressing evidence and dismissing the charge of unlawful possession of a controlled substance, methamphetamine, against William Pippin.  Pippin was a homeless man, living in an opaque tent-like structure on public land in Vancouver.  As part of an attempt to notify individuals of a new camping ordinance, police officers approached Pippin's tent and requested that he come out.  Because Pippin did not come out after an uncertain amount of time and because of noises they heard in the tent, the officers felt they were in danger and one officer lifted a flap of Pippin's tent to look inside.  In the tent, the officers observed a bag of methamphetamine.

Pippin was charged with unlawful possession of a controlled substance.  The trial court granted his motion to suppress the evidence found in his tent, leading to a dismissal of the charge.

The State appeals, contending that (1) the trial court erred in determining that Pippin had a privacy interest in his tent under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution, (2) if Pippin's tent is entitled to constitutional privacy protection, the trial court erred in concluding that the officers' act of opening and looking into the tent was not justified as a protective sweep or through exigent circumstances based on officer safety, and (3) the trial court's findings of fact 7, 8, and 9 on the motion to suppress are not supported by substantial evidence in the record and rest on improper judicial notice.

In the published portion of this opinion, we hold that Pippin's tent and its contents were entitled to constitutional privacy protection under article I, section 7. In the unpublished portion, we hold that the warrantless search of his tent was not justified as a protective sweep, but that the trial court used an incorrect legal standard in deciding that the search was not justified by concern for officer safety. We also hold that findings of fact 7 and 9 are not supported by substantial evidence and that it is not necessary to resolve the challenge to finding of fact 8. Any invalidity, however, has no effect on the resolution of this appeal.

Accordingly, we affirm in part, reverse in part, and remand to the trial court to determine whether officer safety concerns justified the warrantless intrusion.

FACTS

1.    Background

For a two and a half month period in 2015, police ceased enforcing former Vancouver Municipal Code (VMC) 8.22.040 (1997), which barred camping on public property without

permission. In October 2015, officers began notifying those camping on public property of a

newly revised VMC 8.22.040,[1] which permitted camping only between 9:30 p.m. and 6:30 a.m.

A community of approximately 100 homeless individuals living in 80 or so different

campsites had arisen in downtown Vancouver. On October 29, officers began notifying people

in the downtown area of the new ordinance, either making contact at each campsite or leaving a

written notice posted on the outside of the campsite if no one was present. The written notices

stated that individuals needed to comply with the revised ordinance by removing their camps

after 6:00 a.m. "by the middle of the next week." Clerk's Papers (CP) at 36. October 29, 2015

was a Thursday. Upon approaching Pippin's campsite that day, officers found no one present

and left such a notice, inside plastic, affixed to his tent structure with a safety pin.

2.      Police Contact with Pippin

On Monday, November 2, Vancouver police officers Tyler Chavers and Sean Donaldson

were preparing to continue warning campers or arresting those who had been warned earlier.

Chavers and Donaldson were briefed at a safety meeting that morning not to get lax, because

people in the downtown area could be wanted for violent crimes and because that area had

experienced prior service calls for assault and robbery. The officers also had personal

---

[1] As revised, VMC 8.22.040 reads:
    Unlawful camping.
    A. During the hours of 6:30 a.m. to 9:30 p.m., it shall be unlawful for any person
    to camp, occupy camp facilities for purposes of habitation, or use camp
    paraphernalia in the following areas, except as otherwise provided by ordinance or
    as permitted pursuant to Section 8.22.070 of this ordinance:
            1. any park;
            2. any street; or
            3. any publicly owned or maintained parking lot or other publicly owned or
    maintained area, improved or unimproved.

knowledge that some homeless individuals in the area armed themselves with homemade weapons, such as bike parts, chains, and machetes.

At 10:35 a.m., Chavers and Donaldson went to Pippin's camp to make contact with him and either cite and arrest him or warn him for violating the new ordinance. Pippin's tent-like structure was covered with a tarp and set between a guardrail on a public road and a chain link fence that was on private property. The officers could not see inside his tent.

What happened next is not precisely clear from the trial court's findings of fact or the record on appeal. Importantly, it is unclear whether the following events occurred over a very short amount of time or several minutes.

Donaldson rapped on Pippin's tent, announced that police were present, and asked if anyone was there. Pippin, in a groggy voice replied, "Hello, yeah here, just waking up." CP at 38. The officers then asked Pippin if he was alone, and Pippin said that he was. The officers told Pippin that he needed to exit his tent so that they could give him a document and to talk to him about the ordinance. Pippin slowly and lethargically responded that he would come out in a moment.

Over an uncertain amount of time, Donaldson continued to talk to Pippin while Chavers spoke with another officer. The officers told Pippin "several times" that they needed to see him. CP at 39. At some point, the officers "heard movement under the tarp" and started to become concerned with the amount of time Pippin was taking to come out of his tent and that he could have a weapon. Chavers attempted to use a flashlight to see inside the tent, but could not do so. Donaldson told the defendant he was going to lift the tarp to see inside, and Pippin said that was

4

okay.[2] Donaldson lifted the tarp and observed Pippin sitting up in his bed and turning toward him. Chavers noticed a bag of methamphetamine in the tent.

Donaldson testified that "about five minutes" elapsed from the start of the encounter to when he told Pippin he was going to look inside the tent. Report of Proceedings (RP) at 62. Chavers, on the other hand, testified that they waited from five seconds to two minutes before lifting the tarp. In uncontested finding of fact 42, the trial court determined that "[s]everal seconds elapsed without the defendant coming out from under the tarp." CP at 38. However, the finding's context strongly suggests that this describes the period from the time the officers heard movement under the tarp to when they looked into the tent.

3.      Procedure

The State charged Pippin with possession of a controlled substance, methamphetamine. He moved to suppress the evidence derived from Donaldson lifting the flap and looking into the tent, arguing that it was an unconstitutional search under the Fourth and Fourteenth Amendments of the United States Constitution and article I, section 7 of the Washington Constitution. The State opposed the motion, arguing that Pippin had no privacy interest in his tent and, even if he did, the officers conducted a protective sweep incident to his arrest or were presented with exigent circumstances, specifically a threat to officer safety, that justified a warrantless search.

The trial court granted Pippin's motion to suppress, ruling that he had a constitutional privacy interest in his tent. In concluding so, the court primarily relied on *United States v.*

---

[2] The State does not argue that Pippin consented to the search.

No. 48540-1-II

*Sandoval*, 200 F.3d 659 (2000), a 9th Circuit opinion dealing with whether an individual illegally camped could have a privacy interest in his tent under the Fourth Amendment. The trial court also entered findings of fact, among which were findings 7, 8, and 9, which are disputed by the parties on appeal. These findings state:

> 7. Portable restrooms were set up to serve this community.
>
> 8. Agencies were coming down and providing huts to the homeless and aiding them.
>
> 9. Some members of this community were expressing their right to bear arms and were walking around like a security force.

CP at 35.

As to the State's arguments regarding a protective sweep or exigent circumstances, the trial court entered the following pertinent conclusions of law:

> 9. In order for officers to search an area under protective sweep exigency there must be a balancing of the officer safety concern against the defendant's expectation of privacy.
>
> 10. The officers had a legitimate concern for their safety.
>
> 11. The defendant's privacy interest in the tent under these circumstances outweighed the officers' concern for their safety.
>
> 12. Because the officers did not have a search warrant for the defendant's structure and their safety concerns did not outweigh the defendant's reasonable expectation of privacy, the search was unlawful and the evidence is suppressed as fruit of the poisonous tree.

CP at 41.

The trial court accordingly entered an order suppressing the incriminating evidence retrieved from the tent, and an order dismissing the case. The State appeals.

6

ANALYSIS

## I. STANDARD OF REVIEW

Generally, we review a trial court's ruling on a suppression motion to determine whether substantial evidence supports the challenged findings and whether those findings support the trial court's conclusions of law. *State v. Gibson*, 152 Wn. App. 945, 951, 219 P.3d 964 (2009). Substantial evidence is evidence that would persuade a fair-minded person of the truth of the declared premises. *Id.* Unchallenged findings are treated as verities on appeal. *Id.* We review conclusions of law to determine whether they are supported by the findings and are legally correct. *State v Smith*, 196 Wn. App. 224, 230, 382 P.3d 721 (2016), *review granted*, 187 Wn.2d 1025 (2017).

## II. ARTICLE I, SECTION 7 OF THE WASHINGTON CONSTITUTION

The State argues that the trial court erred in determining that Pippin had a privacy interest in his tent under the Fourth Amendment and article I, section 7. When presented with arguments under both the state and federal constitutions, we start with the state constitution. *State v. Hinton*, 179 Wn.2d 862, 868, 319 P.3d 9 (2014). It is well established "that article I, section 7 qualitatively differs from the Fourth Amendment . . . and in some areas provides greater protections than does the federal constitution." *State v. Athan*, 160 Wn.2d 354, 365, 158 P.3d 27 (2007). Accordingly, "a *Gunwall* analysis is unnecessary to establish that this court should undertake an independent state constitutional analysis." *Athan*, 160 Wn.2d at 365. "The only relevant question is whether article I, section 7 affords enhanced protection in the particular context."[3] *Id.*

---

[3] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

Our Supreme Court has previously declined to engage in a Fourth Amendment analysis when article I, section 7 is found to protect the asserted privacy interest. *See Hinton*, 179 Wn.2d at 868. However, we may utilize well-reasoned persuasive authority from federal courts and sister jurisdictions to resolve a question of first impression concerning the scope of article I, section 7. *See State v. Chenoweth*, 160 Wn.2d 454, 470-71, 158 P.3d 595 (2007). Following this authority, we analyze Pippin's asserted privacy interest under article I, section 7, not the Fourth Amendment, but rely on some of the federal circuit and other state cases to guide our reasoning.

Article I, section 7 mandates that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." We focus in this analysis on the first of these grounds, disturbance of private affairs.

Unlike the Fourth Amendment, where a search occurs if the government intrudes upon a subjective and reasonable expectation of privacy, *see Katz v. United States*, 389 U.S. 347, 351-52, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), the inquiry under article I, section 7 focuses on protecting "'those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant.'" *State v. Young*, 123 Wn.2d 173, 181, 867 P.2d 593 (1994) (quoting *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984)). Instead of examining whether an individual's expectation of privacy is reasonable, "the focus is whether the 'private affairs' of an individual have been unreasonably violated." *State v. Boland*, 115 Wn.2d 571, 580, 800 P.2d 1112 (1990). The inquiry into private affairs under the state constitution is broader than the inquiry into reasonable expectation under the federal constitution. *Young*, 123 Wn.2d at 181.

The holdings of our Supreme Court give some definition to the contours of "private affairs." The court has held that the State unreasonably intruded into a person's private affairs when it obtained long distance telephone toll records through a pen register, *State v. Gunwall*, 106 Wn.2d 54, 68, 720 P.2d 808 (1986), examined the contents of a defendant's trash placed on the curb for pickup, *Boland*, 115 Wn.2d at 578, randomly checked hotel registries to determine who were guests at a hotel, *State v. Jorden*, 160 Wn.2d 121, 131, 156 P.3d 893 (2007), attached a global positioning system tracking device to a defendant's vehicle, *State v. Jackson*, 150 Wn.2d 251, 264, 76 P.3d 217 (2003), and read through text messages on a cell phone. *Hinton*, 179 Wn.2d at 865.

On the other hand, no private affairs were deemed violated when the State used Department of Licensing records, *State v. McKinney*, 148 Wn.2d 20, 30, 60 P.3d 46 (2002), power usage records, *In re Pers. Restraint of Maxfield*, 133 Wn.2d 332, 354, 945 P.2d 196 (1997),[4] or saliva voluntarily placed on an envelope. *Athan*, 160 Wn.2d at 372.

More specifically, in defining the scope of protection under article I, section 7, we examine "the history of the interest at stake, relevant case law and statutes, and the current implications of recognizing or not recognizing the interest." *State v. Walker*, 157 Wn.2d 307, 314, 138 P.3d 113 (2006). As part of this, we examine whether the nature of the information obtained through the governmental trespass potentially reveals intimate or discrete details of a

---

[4] Although a plurality in *Maxfield* found an article I, section 7 violation, five justices agreed that article I, section 7 did not protect power usage records. *See generally Maxfield*, 133 Wn.2d 332.

person's life. *Hinton*, 179 Wn.2d at 869. Thus, our analysis relies on relevant case law and focuses on (1) the historical protections afforded to the privacy interest, (2) the nature of information potentially revealed from the intrusion, and (3) the implications of recognizing or not recognizing the asserted privacy interest.

A.      Historical Protections

Neither party cites to any historical protections that have been afforded to homeless individuals in makeshift shelters. However, in applying article I, section 7 our Supreme Court has held that "'the closer officers come to intrusion into a dwelling, the greater the constitutional protection.'" *State v. Ferrier*, 136 Wn.2d 103, 112, 960 P.2d 927 (1998) (quoting *Young*, 123 Wn.2d at 185). The *Ferrier* court recognized that this principle has historical antecedents as far back as a 1763 speech given in Parliament by William Pitt, Earl of Chatham, proclaiming that:

> The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!

*Ferrier*, 136 Wn.2d at 112 n.6.

More recently, the legislature has recognized the trials and tribulations that homeless individuals face and has afforded them some privacy protection. In 2005, the legislature enacted the Homelessness Housing and Assistance Act, chapter 43.185C RCW, which sought "to end homelessness in Washington by July 1, 2015." RCW 43.185C.005. The Act defines "homeless person" to include, among others, individuals "living outside or in a building not meant for human habitation or which they have no legal right to occupy." RCW 43.185C.010(12). The legislature found that

> [d]espite laudable efforts by all levels of government, private individuals, nonprofit organizations, and charitable foundations to end homelessness, the number of homeless persons in Washington is unacceptably high. The state's homeless population, furthermore, includes a large number of families with children, youth, and employed persons. . . .
>
> The legislature finds that there are many causes of homelessness, including a shortage of affordable housing; a shortage of family-wage jobs which undermines housing affordability; a lack of an accessible and affordable health care system available to all who suffer from physical and mental illnesses and chemical and alcohol dependency; domestic violence; and a lack of education and job skills necessary to acquire adequate wage jobs in the economy of the twenty-first century.

RCW 43.185C.005.

In service of its goals, the Act created a "homeless client management information system" to collect and streamline information for homeless individuals. RCW 43.185C.180. But before information can be collected from a homeless individual, the legislature specifically required that such an individual provide informed consent. *See* RCW 43.185C.180(2)(a). If the data will be merged with other systems or reporting, the State is required to "[p]rotect the right of privacy of individuals." RCW 43.185C.180(5)(a). Thus, this Act provides a small window into the realities of homeless life and conveys a general respect for the privacy of homeless individuals' personal information.

Pitt's speech and these legislative provisions are far from dispositive as to whether Pippin's tent should be afforded article I, section 7 protection. However, the historical context they afford guides the trajectory of our article I, section 7 analysis.

B.     Intimate or Discrete Details of a Person's Life

When historical protections, among other considerations, are not dispositive, the most

11

important inquiry is whether the challenged action potentially reveals intimate details of a person's life. *See Jorden*, 160 Wn.2d at 128-29. Washington courts have found that an individual's intimate affairs are revealed if a search divulges: the places where an individual travels, "reveal[ing] preferences, alignments, associations, personal ails and foibles," *Jackson*, 150 Wn.2d at 262, the "contents of people's text messages[, which] exposes a 'wealth of detail about [a person's] familial, political, professional, religious, and sexual associations,'" *Hinton*, 179 Wn.2d at 869 (second alteration in original) (quoting *United States v. Jones*, 565 U.S. 400, 415, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012)), and whether a person is present or not in a hotel room, *Jorden*, 160 Wn.2d at 129. The thread running through these examples is the disclosure of beliefs or associations, whether familial, political, religious, or sexual, as well as the disclosure of intimate or personally embarrassing information.

Our case law views the home as the type of property that secures an individual's most personal possessions and conduct. "In no area is a citizen more entitled to his privacy than in his or her home," *Young*, 123 Wn.2d at 185, and "'the closer officers come to intrusion into a dwelling, the greater the constitutional protection.'" *Id*. (quoting *State v. Chrisman*, 100 Wn.2d 814, 820, 676 P.2d 419 (1984)). Thus, in determining whether Pippin's private affairs were disturbed, we examine the characteristics his tent shares, and does not share, with a dwelling.

In *Silverman v. United States*, 365 U.S. 505, 512 n.4, 81 S. Ct. 679, 5 L. Ed. 2d 734 (1961), the United States Supreme Court spoke to this question:

> "A man can still control a small part of his environment, his house; he can retreat thence from outsiders, secure in the knowledge that they cannot get at him without

disobeying the Constitution. That is still a sizable hunk of liberty—worth protecting from encroachment. *A sane, decent, civilized society must provide some such oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle*."

(Emphasis added) (quoting *United States v. On Lee*, 193 F.2d 306, 315-16 (2nd Circ. 1951)).

Similarly, *Rakas v. Illinois*, 439 U.S. 128, 142-43, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), recognized that the traditional home is not the only place in which a person should have privacy protection:

> We think that *Jones* on its facts merely stands for the unremarkable proposition that a person can have a *legally sufficient interest in a place other than his own home* so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place.

(Emphasis added.)

*Silverman* and *Rakas* counsel that an individual can have a privacy interest in a place other than a traditional home and, according to *Silverman*, society must allow some place where individuals are free from unreasonable searches.

Courts have already recognized zones of privacy for homeless individuals by finding that their closed baggage and containers are protected because it would reveal their personal matters. *See, e.g.*, *State v. Mooney*, 218 Conn. 85, 588 A.2d 145, 152, 154 (1991) (privacy right in duffel bag and cardboard box). Further, our Supreme Court has stated that "readily recognizable personal effects are protected from search to the same extent as the person to whom they belong." *State v. Parker*, 139 Wn.2d 486, 498-99, 987 P.2d 73 (1999). That is, "[p]ersonal items may be 'so intimately connected with' an individual that a search of the items constitutes a search of the person." *Id.* (quoting *State v. Hill*, 123 Wn.2d 641, 643-44, 870 P.2d 313 (1994)).

13

Under the case law set out above, the more Pippin's tent served as a refuge or retreat from the outside world, the more it could be the repository of objects or information showing his familial, political, religious, or sexual associations or beliefs, and the more it could contain objects intimately connected with his person, then the more his tent and the belongings within should be considered part of his private affairs under article I, section 7.

Pippin's tent allowed him one of the most fundamental activities which most individuals enjoy in private—sleeping under the comfort of a roof and enclosure. *Cf. Jorden*, 160 Wn.2d at 131 (guest sleeping at hotel has privacy interest). The tent also gave him a modicum of separation and refuge from the eyes of the world: a shred of space to exercise autonomy over the personal. These artifacts of the personal could be the same as with any of us, whether in physical or electronic form: reading material, personal letters, signs of political or religious belief, photographs, sexual material, and hints of hopes, fears, and desire. These speak to one's most personal and intimate matters.

The law is meant to apply to the real world, and the realities of homelessness dictate that dwelling places are often transient and precarious. The temporary nature of Pippin's tent does not undermine any privacy interest. *See Jorden*, 160 Wn.2d at 131 (hotel guest); *Stoner v. State of Cal.*, 376 U.S. 483, 490, 84 S. Ct. 889, 11 L. Ed. 2d 856 (1964) (hotel rooms); *State v. Houvener*, 145 Wn. App. 408, 416, 186 P.3d 370 (2008) (interior hallways of a dormitory) (collecting cases). Nor does the flimsy and vulnerable nature of an improvised structure leave it less worthy of privacy protections. For the homeless, those may often be the only refuge for the private in the world as it is.

14

Under the case law above, Pippin's tent was the sort of closed-off space that typically shelters the intimate and discrete details of personal life protected by article I, section 7.

The State argues that because Pippin was wrongfully occupying public property, the tent was not entitled to privacy protection, citing *State v. Cleator*, 71 Wn. App. 217, 857 P.2d 306 (1993), a decision by Division One of our court. In *Cleator*, police had information that a burglar fled into the woods behind the house he had entered. *Id.* at 218. In the woods, police found an unoccupied tent unlawfully erected on public land. *Id.* at 218, 222. After determining that no one was present, the officer opened the flap of the tent and observed items that matched the reported stolen goods from the burgled home. *See id.* at 218.

In examining whether Cleator had a reasonable expectation of privacy in the tent under the Fourth Amendment, the court stated:

> Lance Cleator . . . wrongfully occupied public land by living in a tent erected on public property. The public property was not a campsite, and it is undisputed that . . . Cleator . . . [lacked] permission to erect a tent in that location. Under these circumstances, he could not reasonably expect that the tent would remain undisturbed. As a wrongful occupant of public land, Cleator had no reasonable expectation of privacy at the campsite because he had no right to remain on the property and could have been ejected at any time. . . . Officer Denevers only raised the tent flap and observed what was clearly visible and seized only that which he knew to be wrongfully obtained. Because he did not disturb Cleator's personal effects, his actions did not violate Cleator's limited expectation of privacy.

*Id.* at 222 (citations and footnotes omitted). The court then turned to whether article I, section 7 provided Cleator a privacy interest, finding that

> [a]lthough article [I], section 7 provides greater protection for privacy interests than the Fourth Amendment, Cleator's claim of unreasonable search and seizure also fails on independent state grounds. No case has been cited nor has our research

15

> disclosed any authority indicating that our citizens have ever held unlimited privacy rights to property they wrongfully occupied. We hold that Officer Denevers' look into the tent and limited entry to retrieve stolen property did not unreasonably intrude into Cleator's private affairs because Cleator's personal effects were not disturbed.

*Id.* at 223 (citation omitted).

We decline to follow *Cleator* for several reasons. First, *Cleator* predominantly analyzed the Fourth Amendment in determining that Cleator's privacy interests were not violated. Further, in coming to its conclusion, *Cleator* heavily relied on the proposition that other federal circuits had "rejected an individual's claim to a right of privacy in the temporary shelter he or she wrongfully occupies on public property." *Id.* at 220 (citing *United States v. Ruckman*, 806 F.2d 1471, 1472-73 (10th Cir. 1986); *Amezquita v. Hernandez-Colon*, 518 F.2d 8, 11 (1st Cir. 1975)). Those cases, though, have been called into question by the 9th Circuit, which has held that the reasonableness of an individual's expectation of privacy is not lessened when he or she wrongfully occupies public property. *See Sandoval*, 200 F.3d at 661 n.4 (noting its disagreement with *Ruckman*).

Finally, Division One itself has now departed from *Cleator*'s view that unlawfully occupying land diminishes one's privacy rights. In *State v. Wyatt*, noted at 187 Wn. App. 1004 (2015) (unpublished),[5] the defendant was illegally camped in a park with other individuals. *Id.* at *1. Police contacted Wyatt and told him he had 24 hours to vacate the campsite. *Id.* A few

---

[5] Under GR 14.1(c), we may cite and discuss an unpublished opinion when, as here, it is necessary for a reasoned decision.

hours later, police returned and searched two closed containers located outside of Wyatt's tent, where they found methamphetamine and drug paraphernalia. *Id.* Division One agreed with Wyatt that this search unlawfully violated his privacy interests in the closed containers located outside his tent. *Id*. at *14.

*Wyatt*'s article I, section 7 analysis did not address *Cleator*. Its Fourth Amendment analysis distinguished *Cleator* in part by noting that *Cleator* had been called into question by the holding in *Sandoval*, 200 F.3d at 661, that a person's expectation of privacy does not turn on whether an individual has a right to remain on the land. *See Wyatt*, noted at 187 Wn. App. at *8-12. Thus, in both its holding and analysis, Division One of our court has departed from *Cleator*.

*Cleator*'s holding is inconsistent with *Sandoval*, and its rationale was abandoned by *Wyatt*. For these and the other reasons just noted, we join the approach of *Sandoval* and *Wyatt* and hold that Pippin's privacy interests are not diminished by his lack of permission to camp at that location.[6]

The second consideration, whether the disclosure of intimate and personal details of a person's life is at stake, weighs in favor of Pippin having a privacy interest.

C.     Implications of Recognizing the Privacy Interest

We next turn to the final consideration, an examination of the "current implications of recognizing or not recognizing the interest." *Walker*, 157 Wn.2d at 314. In acknowledging this consideration, the *Walker* court drew on the analysis in *McKinney*, 148 Wn.2d at 29, which, after concluding its historical review, examined the nature and extent to which police learned about a

---

[6] Our opinion does not address the State's right to arrest for misdemeanors, nor do we opine whether a privacy right would play any role in an eviction.

person's personal contacts and associations as a result of the government conduct. *McKinney*'s subsequent analysis made clear it was concerned with whether the State's action would disclose "intimate details of the defendants' lives, their activities, or the identity of their friends or political and business associates," *id.* at 30, also including financial dealings and movements. *Id.* at 32. This inquiry, the court specified, involves the extent to which the subject matter is voluntarily exposed to the public, *id.* at 30, and consideration of the purpose served by the State's action. *Id.* at 32.

Turning first to the nature of the information obtained, the analysis in Part II, B, above, makes clear that denying Pippin the protections of article I, section 7 in his tent would expose to state scrutiny precisely the sort of intimate and personal information with which the *McKinney* court was concerned. This inquiry leans heavily in favor of constitutional protection.

Next, Pippin did not voluntarily expose this sort of information to public scrutiny. Some may argue that Pippin did so by choosing to live in a tent on public land in the middle of a city. Our legislature, however, has found that

> there are many causes of homelessness, including a shortage of affordable housing; a shortage of family-wage jobs which undermines housing affordability; a lack of an accessible and affordable health care system available to all who suffer from physical and mental illnesses and chemical and alcohol dependency; domestic violence; and a lack of education and job skills necessary to acquire adequate wage jobs.

RCW 43.185C.005. Against this backdrop, to call homelessness voluntary, and thus unworthy of basic privacy protections is to walk blind among the realities around us. Worse, such an argument would strip those on the street of the protections given the rest of us directly because of their poverty. Our constitution means something better.

Finally, as to purpose, the city was engaged in a laudable effort to inform Pippin and others of new camping regulations and the consequences of not complying. Although important, this purpose is only a feather in the balance against ensuring the privacy of the intimate and personal details that lie at the heart of article I, section 7.

Thus, the third criterion, the implications of recognizing or not recognizing the interest, weighs in favor of Pippin having a privacy interest.

D.     Conclusion

King Lear, stripped of purse and crown, saw his kingdom as for the first time:

> Poor naked wretches. . . .
> . . . .
> How shall your houseless heads and unfed sides,
> Your loop'd and windowed raggedness defend you
> From seasons such as these?  O, I have ta'en
> Too little care of this!  Take physic, pomp;
> Expose thyself to feel what wretches feel,
> That thou mayst . . . show the heavens more just.

*King Lear*, William Shakespeare, Act 3, Scene 4, Lines 32-41 (1606).

These words remind us that the law is something more than a stay against anarchy or oil for the wheels of trade. Its work also is to bring signs of justice amid our thirsts and furies and, in doing so, remind us of our humanity.

All three examined factors—the historical protections, the intimate details revealed from a search, and the implications of recognizing the interest—weigh in favor of finding that Pippin's tent functioned as part of his private affairs worthy of protection from unreasonable intrusions. Accordingly, we hold that Pippin's tent and its contents fell among those "privacy interests which citizens of this state . . . should be entitled to hold, safe from governmental trespass absent

a warrant." *Myrick*, 102 Wn.2d at 511. As such, Pippin's tent and contents are protected under article I, section 7 of the Washington Constitution.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

### III.  EXCEPTIONS TO WARRANT REQUIREMENT

The State argues that even if Pippin had a constitutionally protected privacy interest in his tent and belongings, the officers were justified in looking into Pippin's tent (1) to conduct a protective sweep of the area incident to his arrest and (2) to protect officer safety under the exigent circumstances presented. We hold that the protective sweep exception is not applicable and that the trial court erred in using a balancing test to determine whether officer safety concerns justified the search. However, the findings of fact and record are insufficient to determine whether the officer safety exigency would apply in these circumstances. Thus, we reverse the suppression order and remand for further proceedings.

As a general rule, warrantless searches are per se unreasonable. *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996). However, there are a few jealously and carefully drawn exceptions to this rule, including those for protective sweeps incident to arrest and exigent circumstances. *Id.*

A.     Protective Sweep

"A 'protective sweep' is a quick and limited search of premises, *incident to an arrest* and

conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990) (emphasis added). It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding. *Id.* "The concept of a protective sweep was adopted to justify the reasonable steps taken by *arresting* officers to ensure their safety *while making an arrest*." *State v. Boyer*, 124 Wn. App. 593, 600, 102 P.3d 833 (2004) (emphasis added).

When approaching Pippin's tent, Chavers and Donaldson had not decided whether they would give Pippin notice that he was violating the revised ordinance or whether they would cite and arrest him. Further, none of the officers' statements to Pippin indicated that they had decided to place him under arrest. Thus, because the State fails to show that an arrest was taking place, the protective sweep exception does not apply.

B.      Exigent Circumstances—Officer Safety

In general, the exigent circumstances exception to the warrant requirement applies when obtaining a warrant is not practical because the delay inherent in securing it would compromise officer safety, facilitate escape, or permit the destruction of evidence. *State v. Tibbles*, 169 Wn.2d 364, 370, 236 P.3d 885 (2010). "Exigent circumstances involve a true emergency." *State v. Cruz*, 195 Wn. App. 120, 125, 380 P.3d 599 (2016), *review granted*, 399 P.3d 1104 (2017).

Our case law does not prescribe a balancing test to determine whether exigent circumstances are present. Instead, the State "bears a heavy burden" and "must establish the exception to the warrant requirement by clear and convincing evidence." *State v. Garvin*, 166

No. 48540-1-II

Wn.2d 242, 250, 207 P.3d 1266 (2009).  In determining whether the State has met its burden, a court evaluates whether an exigency exists based on the totality of the circumstances presented to the officers.  *State v. Smith*, 165 Wn.2d 511, 518, 199 P.3d 386 (2009); *Tibbles*, 169 Wn.2d at 372.  Specifically, Washington courts

> use[] six factors as a guide in determining whether exigent circumstances justify a warrantless entry and search: (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) whether there is reasonably trustworthy information that the suspect is guilty; (4) there is strong reason to believe that the suspect is on the premises; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the entry is made peaceably.

*State v. Cardenas*, 146 Wn.2d 400, 406, 47 P.3d 127, 57 P.3d 1156 (2002).

> Here, the trial court's conclusions of law 9 through 12 read:
>
> 9.     In order for officers to search an area under protective sweep exigency there must be a balancing of the officer safety concern against the defendant's expectation of privacy.
>
> 10.    The officers had a legitimate concern for their safety.
>
> 11.    The defendant's privacy interest in the tent under these circumstances outweighed the officers' concern for their safety.
>
> 12.    Because the officers did not have a search warrant for the defendant's structure and their safety concerns did not outweigh the defendant's reasonable expectation of privacy, the search was unlawful and the evidence is suppressed as fruit of the poisonous tree.

CP at 41.

We read these conclusions of law to use a balancing test to determine whether either the protective sweep exception or the exigent circumstances exception based on officer safety apply.

22

The protective sweep exception does not apply for the reasons discussed above. The *Cardenas* criteria for exigent circumstances, set out above, do not incorporate a balancing test. Thus, the trial court failed to apply the correct legal standard by using a balancing test instead of the *Cardenas* criteria in determining whether officer safety justified the search.

The record before us speaks to some of the *Cardenas* criteria. For example, the nature of Pippin's offense was not severe or violent and there was no assertion that Pippin might escape. The record also shows that Pippin delayed in coming out of his tent, that the officers heard movement in the tent and could not confirm what Pippin was doing, and that the officers made a limited search of his tent by only looking in.

The trial court also made findings that the officers were aware that some violent crimes had occurred within the community and some of the homeless individuals carried improvised weapons in the encampment. However, in *Cruz* we disapproved of using a generalized concern that Cruz or his companion "*could* have posed a threat *if* they were dangerous" to justify a search of Cruz's truck during an arrest. 195 Wn. App. at 126. In *State v. Chrisman*, 100 Wn.2d 814, 820, 676 P.2d 419 (1984), the court held that "warrantless entries . . . can only be permitted under state law when the officer possesses specific articulable facts justifying custody and/or entry into a private dwelling."

Neither *Cruz* nor *Chrisman* deals with the sort of situation now before us; specific information by police that some members of a category to which the subject belongs had been armed. Because the group consisted only of approximately 100 individuals in a specific location,

we think this information may be considered in applying the *Cardenas* criteria. By itself, though, the information is insufficient to justify a warrantless search.

Most importantly, the amount of time that passed from the first contact to when Donaldson lifted a flap of the tent and looked in is critical to determining whether safety concerns justified the warrantless search. As set out in the Facts, above, officer testimony about the length of this period varied widely: from five seconds to about five minutes. As also shown in the Facts, the findings do not establish the time from the beginning of the encounter to the search.

We may remand a case to the trial court in situations where the findings of fact and record do not provide a sufficient basis for appellate review. *See State v. Bliss*, 153 Wn. App. 197, 208-09, 222 P.3d 107 (2009); *State v. Barber*, 118 Wn.2d 335, 348, 823 P.2d 1068 (1992). With the widely varying testimony about elapsed time, the trial court would be in the best position to make any weight or credibility determinations that would help narrow the range of time elapsed. The trial court also has discretion whether to hold an additional hearing to attempt to obtain more precise testimony about this time period and any considerations under *Cardenas*. Remand would also allow the trial court to make its decision using the *Cardenas* considerations, not an inapplicable balancing test.

To those ends, we reverse the orders suppressing the evidence and dismissing the charge against Pippin and remand this case to the trial court to decide whether the exigent circumstances of officer safety justified the search. The trial court shall make this decision using the

24

considerations from *Cardenas*, set out above. To the extent it can be reasonably based on the evidence, the court shall determine more precisely the amount of time that passed from the officers' initial contact with Pippin to the time of the search. The trial court shall also enter additional findings of fact and conclusions of law that are consistent with this opinion.

IV. CHALLENGES TO FINDINGS OF FACT

The State assigns error to findings of fact 7, 8, and 9, arguing that they are not supported by substantial evidence in the record. Those findings state:

> 7. Portable restrooms were set up to serve this community.
>
> 8. Agencies were coming down and providing huts to the homeless and aiding them.
>
> 9. Some members of this community were expressing their right to bear arms and were walking around like a security force.

CP at 35. The parties argue (1) whether the State invited error, (2) whether the trial court appropriately took judicial notice of these matters, and (3) whether substantial evidence supports the findings. We examine each issue in turn.

A.    Invited Error

Pippin argues that the State invited error by proposing findings of fact 7, 8, and 9 and, as such, is precluded from challenging them on appeal. We disagree.

The doctrine of invited error prohibits a party from setting up an error at trial and then complaining of it on appeal. *State v. Wakefield*, 130 Wn.2d 464, 475, 925 P.2d 183 (1996). Its application to this appeal is controlled by *Hughes v. Boundary Gold Placers*, 193 Wash. 564,

568, 76 P.2d 611 (1938), in which the court held that it cannot "be invited error for an unsuccessful litigant to present findings in accord with a previously announced decision." That is all the State did here; it presented findings in accord with the trial court's oral decision on the suppression motion. Accordingly, Pippin's invited error argument fails.

B.     Judicial Notice

The State argues that judicial notice cannot be used to establish the facts recited in findings 7, 8, and 9. Pippin responds that the State waived its challenge to judicial notice by not raising the issue to the trial court. We disagree that the State waived its challenges and hold that taking judicial notice of the facts recited in these findings was not proper.

1.     Legal Principles

We review de novo whether judicial notice was properly taken. *Fusato v. Wash. Interscholastic Activities Ass'n*, 93 Wn. App. 762, 771, 970 P.2d 774 (1999). A judicially noticed fact is one "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." ER 201(b). "A court may take judicial notice, whether requested or not." ER 201(c).

2.     Waiver

Pippin argues that the State waived its judicial notice challenge to findings of fact 7, 8, and 9 by failing to object in the trial court. Turning to finding of fact 7, the trial court announced at the beginning of the CrR 3.6 hearing that the encampment in question was just two blocks

from the courthouse and that it had observed porta-potties being placed around it. The State did not object. However, the trial court did not make clear that it was taking judicial notice of this fact. Although the trial court stated that it was "important" to put its observation on the record, it also stated that it was unsure whether the existence of porta-potties was "germane" or "really relevant" to this case. RP at 7. This equivocal announcement did not give the State sufficient notice that judicial notice was being taken and that it needed to object.

Pippin also argues that the State waived its judicial notice challenge to finding of fact 7 because it failed to object during the trial court's observations that "[w]e can all take notice [the encampment] could become a health concern with defecation and urination—so bringing porta-potties in there." RP at 74. However, the trial court made this comment in an exchange concerning the legality of Pippin's camping. The court's taking notice that the encampment could become a health concern does not reasonably convey that it was taking judicial notice that porta-potties were in fact present. The State did not waive its judicial notice challenge to finding of fact 7.

As to findings of fact 8 and 9, the trial court expressed the essence of those findings in its oral ruling that

> agencies were coming down there and delivering little huts and such to the homeless people, and aiding them . . . and we had people who decided this was a place to express their right to bear arms and walk around like a security force somewhat.

RP at 93. The court never mentioned these facts until its oral ruling, which effectively deprived the State of notice before the ruling that it needed to object to judicial notice.

For these reasons, the State's judicial notice challenges to findings of fact 7, 8, and 9 are properly before us.

3.      Merits of the Judicial Notice Challenge

Turning to the merits, nothing in the record suggests that findings of fact 7, 8, or 9 were "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." ER 201(b). At best, it appears the trial judge relied on his own knowledge gathered from his personal observations and reading newspapers that these facts were true. "Personal knowledge is not judicial knowledge and the judge may personally know a fact of which he cannot take judicial notice." *In re Estate of Hayes*, 185 Wn. App. 567, 598, 342 P.3d 1161 (2015).

Accordingly, we hold that the record does not support that the trial court appropriately took judicial notice of facts supporting findings 7, 8, and 9.

C.    Substantial Evidence

Even if the trial court did not appropriately take judicial notice of findings 7, 8, and 9, Pippin contends that those findings are supported by substantial evidence. "Substantial evidence is evidence that is sufficient to persuade a fair-minded person of the truth of the stated premise." *State v. Rooney*, 190 Wn. App. 653, 658, 360 P.3d 913 (2015), *review denied*, 185 Wn.2d 1032 (2016).

As to finding of fact 7, Pippin does not present argument that substantial evidence supports this finding, nor does he point us to any evidence that does so. *See id.* It is not our role to comb the record for evidence that might support a party's argument. *See In re Estate of Lint,*

135 Wn.2d 518, 531-32, 957 P.2d 755 (1998).  Therefore, we hold that finding of fact 7 is not supported by substantial evidence.

Turning to finding of fact 8, Pippin argues that the following excerpts from Chavers' testimony supply substantial evidence supporting it:

> [Police] put together a project to go out and address the issue around the Sharehouse as well as the surrounding neighborhoods, whether it involved RVs, cars, tents, portable huts that were donated, and things like that.
>
> . . . .
>
> [Sharehouse is] a social service agency.  I mean this specific Sharehouse, they feed, they allow for showers and laundry on occasion, some temporary storage of property.  It's a place where a lot of homeless folks will visit for food or -- there's also outreach there, counsel for the homeless, and some other agencies that -- you know, so they will network there for mail, I think sometimes job outreach kind of things.

RP at 13, 27.

Finding of fact 8 reads:  "*Agencies* were coming down and providing huts to the homeless and aiding them."  CP at 35 (emphasis added).  Chavers' testimony supports that at least one agency, Sharehouse, was providing portable huts and assistance to the homeless.  Nothing supports that any agency other than Sharehouse was lending its support.  Whether one agency or several were providing services is irrelevant to the sense of this finding, and the finding itself plays no role in our resolution of this appeal.  Thus, we do not further consider the challenge to this finding.

Finding of fact 9 states that "[s]ome members of this community were expressing their right to bear arms and were walking around like a security force."  CP at 35.  Pippin argues that the following excerpt from Chavers' testimony supports the finding:

> So we assume that all the folks that were living down there had armed themselves in one way or another because of calls for service unrelated to camping.
>
> There had been assault calls, there had been a robbery, there had been some other calls for service down there where folks had armed themselves with a bike lock, camping implements, machetes, chain -- links of chain, things that people have donated -- bike parts, and stuff like that.

RP at 35.

Nothing from Chavers' testimony can be taken to support that individuals were walking around like a security force. Further, Chavers' testimony that people were carrying improvised weapons is not substantial evidence that they were "expressing their right to bear arms." Finding of fact 9 is not supported by substantial evidence.

## V. APPELLATE COSTS

Pippin asks that this court exercise its discretion to deny any appellate costs the State requests. If the State requests appellate costs, Pippin may challenge that request before a commissioner of this court under RAP 14.2.

## CONCLUSION

We hold that Pippin's tent and its contents are among those private affairs protected under article I, section 7 of the Washington State Constitution. The warrantless search of his tent was not justified as a protective sweep, but the trial court used an incorrect legal standard in deciding that the search was not justified by concern for officer safety. Findings of fact 7 and 9 are not supported by substantial evidence and it is not necessary to consider the challenge to finding of fact 8.

No. 48540-1-II

Accordingly, we affirm the trial court's determination that Pippin's tent and its contents were protected by article I, section 7 of the state constitution, but we reverse the trial court's orders suppressing evidence and dismissing the charge. We remand to the trial court to decide whether the exigent circumstances of officer safety justified the search, using the considerations from *Cardenas*, set out above. The trial court may hold a new hearing and shall enter additional findings of fact consistently with this opinion.

Bjorgen, C.J.

BJORGEN, C.J.

We concur:

WORSWICK, J.

LEE, J.

31